[S.F. No. 24520. Oct. 17, 1983.]

RIVCOM CORPORATION et al., Petitioners, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

744

750

**COUNSEL**

Campagne & Giovacchini, Thomas E. Campagne, Thomas M. Giovacchini,
L. Kim Aguirre and Gerald Lee Tahajian for Petitioners.

Ellen Lake, Manuel M. Medeiros, Nancy C. Smith, Robert W. Farnsworth and Edwin F. Lowry for Respondent.

Dianna Lyons, Federico G. Chavez, Ellen J. Eggess, Daniel A. Garcia, Ira Gottlieb and Wendy Jones for Real Party in Interest.

## OPINION

**GRODIN, J.**—Rivcom Corporation (Rivcom), its parent Riverbend Farms, Inc. (Riverbend), and Triple M. Farms, Inc. (Triple M) petition for review of a decision of the Agricultural Labor Relations Board (Board) that the first two companies (collectively the growers) committed acts prohibited by section 1153, subdivisions (a), (c), and (e) of the Agricultural Labor Relations Act of 1975 (ALRA or Act) (Lab. Code, § 1140 et seq.). The findings under subdivisions (a) and (c)[1] are that the growers, as new operators of a large citrus farm in Ventura County, sought to avoid unionization by replacing the resident union-affiliated employees of the farm's previous owner with nonunion workers, and by evicting the resident employees from their labor-camp housing. The Board also upheld allegations that the growers violated subdivision (e) by refusing to bargain in good faith with the United Farm Workers of America (UFW), the certified representative of the predecessor employees.[2] The remedy imposed includes broad cease-and-desist and bargaining orders, combined with reinstatement, backpay, and make-whole relief.

We must decide, among other things, what deference is due the Board when it infers from circumstantial evidence that refusal to hire a predecessor's workers was prompted by a prohibited antiunion motive. We conclude that substantial evidence on the whole record supports the Board's decision here. We also reject the petitioners' remaining contentions. Therefore, we enforce the Board's order.

---

[1]Section 1153 provides:

"It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152.

". . . . . . . . . . . . . . . . . . .

"(c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization. . . ."

All statutory references are to the Labor Code unless otherwise indicated or apparent.

[2]Section 1153, subdivision (e) makes it an unfair labor practice "[t]o refuse to bargain collectively in good faith with labor organizations certified pursuant to the provisions of Chapter 5 (commencing with Section 1156) of this part."

## 1. *Facts.*

Rivcom Ranch, formerly known as Rancho Sespe, lies near Santa Paula in Ventura County. The property includes some 4,300 acres, about 1,500 of which are devoted to its principal crops, citrus and avocadoes. Between 1973 and January 1979 the ranch was owned by PIC Realty Company (PIC), a subsidiary of Prudential Insurance Company.

National Property Management Systems, Inc. (NPMS) supervised farming operations under contract with PIC. NPMS employed a year-round agricultural workforce living in labor-camp housing on the premises. The resident employees numbered as many as 140. Most had worked on the ranch for a considerable period, some as long as 10 years. There was evidence that its recent operations had not been profitable.

On May 9, 1978, the UFW won a representation election among the ranch workers. The union was certified on May 17 as the bargaining representative of all agricultural employees of "Rancho Sespe."

In the same year, a group of investors began negotiations to buy the ranch. Newport Properties, Inc. (Newport) was organized for this purpose. The investors eventually decided to lease the ranch for farming purposes to Larry Harris, president and principal shareholder of Riverbend. That company operated as a packer and marketer of citrus for many Ventura County growers. Harris was interested in the ranch primarily as a source of crops for Riverbend's packing operation.

Harris testified he toured the property early in January 1979, saw the need for drastic operational changes, and decided that the current workers should not be rehired because they would resist change. He admitted he became aware "sometime in 1978" that the UFW had won an election among the ranch employees.

On January 16, 1979, PIC sold Rancho Sespe to Paraships Builders, which immediately conveyed it to Newport. Newport, in turn, leased the land to Rivcom, a wholly owned subsidiary of Riverbend. The annual rent was to be at least equal to Rivcom's "net profit" from farming operations, up to $1.675 million.

On the day of the sale, an NPMS official informed the Rancho Sespe employees that their jobs were terminated. Within the next two days, Riv-

com served 30-day eviction notices on the workers.[3] Rivcom quickly obtained nonunion agricultural employees from Triple M, a statewide labor supplier with which Riverbend had a longstanding relationship. The number of farmworkers hired was far fewer than that NPMS had employed. None of the former Rancho Sespe workers was considered for reemployment.

On January 18, Emilio Huerta, a UFW agent, telephoned Harris' lawyer, Thomas Campagne. Campagne told Harris that Huerta had demanded recognition of the union, reinstatement of all the displaced employees, withdrawal of the eviction notices, and immediate bargaining about operational changes and a permanent contract. On January 19, the UFW sent Rivcom a mailgram containing essentially the same demands; Rivcom simultaneously received in the mail a copy of unfair labor practice charges filed with the Board.

Harris testified he was confused about receiving demands and charges at the same time. He ordered Campagne to respond to Huerta. Campagne's letter, dated January 19, addressed the recognition issue only. It urged that the prior UFW certification was not binding on Rivcom, and that Rivcom's recognition of the union might violate subdivision (f) of section 1153.[4] No mention was made of the hiring and eviction matters.

On January 31, about 60 former Rancho Sespe employees walked together to the ranch office. Some carried signs saying "We want our jobs." A delegation went in and asked to speak to Harris. After a few minutes, a security guard told them Harris would talk to them outside. The group waited in the rain for about 30 minutes. A deputy sheriff, Juan Mendez, then requested that they leave the property. The group's leader, Jaime Zepeda, asked Mendez, who had experience in labor relations, to relay a message to Harris. After talking with Harris, Mendez told the workers Harris did not wish to speak with them, and they dispersed.[5]

On February 5, Harris received a letter from the UFW dated February 1. It recited that "[t]he former employees of . . . Rancho Sespe," including

---

[3]The "license agreement" between NPMS and its resident workers provided for vacation of the premises within 24 hours after termination of employment. The growers urge that the "extension" granted by the 30-day notices was intended to avert hardship and demonstrates their good will.

[4]Under section 1153, subdivision (f), it is an unfair labor practice for an employer "[t]o recognize, bargain with, or sign a collective-bargaining agreement with any labor organization not certified pursuant to the provisions of this part."

[5]Mendez testified that the situation was potentially volatile. According to Mendez, Harris seemed apprehensive and said the sheriff's department had told him it would be dangerous to confront the workers.

some 140 persons named on an attached list, "hereby apply for employment with Rivcom . . . ." The letter made no additional demands. It simply declared that, by making application, the employees "do not waive . . . seniority or other rights." A second unfair labor practice charge filed by the UFW was served on Rivcom the same day.

## 2. *The Refusal to Hire.*

The Board adopted the conclusion of the administrative law officer (ALO) that the growers violated subdivisions (a) and (c) of section 1153 when, in order to avoid unionization and collective bargaining, they replaced the UFW-affiliated former Rancho Sespe employees with nonunion workers. That determination is attacked on numerous grounds.

Subdivisions (a) and (c) correspond respectively to section 8(a)(1) and (3) of the National Labor Relations Act (NLRA). (29 U.S.C.A. § 158(a)(1), (3).) As our statute contemplates, we rely where appropriate on "applicable" NLRA precedent. (See § 1148; *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855-856 [176 Cal.Rptr. 753, 633 P.2d 949]; *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 412-413 [128 Cal.Rptr. 183, 546 P.2d 687].)

■ It is an unfair labor practice for an employer "[t]o interfere with, restrain, or coerce" employees in the exercise of their organizational rights (ALRA, § 1153, subd. (a); NLRA, § 8(a)(1)) or "[b]y discrimination in . . . hiring or tenure, . . . to . . . discourage membership in any labor organization." (ALRA, § 1153, subd. (c); NLRA, § 8(a)(3).) While the owner of a business has broad power to restructure its operations and hire his own workers, he violates the Act if he discriminates against union applicants on the basis of antiunion animus. (*Howard Johnson Co.* v. *Hotel Employees* (1974) 417 U.S. 249, 261-262, and fn. 8 [41 L.Ed.2d 46, 56, 94 S.Ct. 2236]; *NLRB* v. *Burns Security Services* (1972) 406 U.S. 272, 280-281, fn. 5, 287-288 [32 L.Ed.2d 61, 68-69, 73, 92 S.Ct. 1571]; *Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 185-186 [85 L.Ed. 1271, 1278, 61 S.Ct. 845]; *N. L. R. B.* v. *Foodway of El Paso* (5th Cir. 1974) 496 F.2d 117, 119-120.)

The growers do not dispute these settled principles. They argue, however, that the record here cannot support the charges.

■ At the outset, the growers invoke the general rule that an employer commits no unfair labor practice by rejecting offers to work which are absolutely conditioned on terms he need not accept. (See, e.g., *Packing*

*House and Indus. Services* v. *N. L. R. B.* (8th Cir. 1978) 590 F.2d 688, 696; *Sawyer Stores, Inc.* (1971) 190 N.L.R.B. 651, 656.) They argue that the Rancho Sespe workers' attempts to apply through the UFW were improperly conditioned on demands for union recognition, collective bargaining, and "all-or-none" reinstatement of the displaced employees.

The Board concluded that the UFW reinstatement applications were not conditional, since any "demands" were nothing more than negotiating ploys. ■■ ■■■■ It was not clear, said the Board, that every applicant would really refuse to work unless the growers agreed to the unwarranted terms.[6]

■■ We need not tarry over the Board's reasoning. Deficient applications are no legal justification for a refusal to hire if proper, timely offers to work would also have been rebuffed. (*Packing House and Indus. Services, Inc., supra,* 590 F.2d at pp. 695-696; *Piasecki Aircraft Corporation* v. *N. L. R. B.* (3d Cir. 1960) 280 F.2d 575, 585, cert. den. (1960) 364 U.S. 912 [5 L.Ed.2d 226, 81 S.Ct. 276]; *Macomb Block and Supply, Inc.* (1976) 223 N.L.R.B. 1285, 1286, enforcement den. on other grounds (6th Cir. 1978) 570 F.2d 1304; see *Kawano, Inc.* (1979) 4 A.L.R.B. No. 104, pp. 4-5.)

The growers' defense to the charge of antiunion motive is founded on the premise that Harris had already decided before January 16 not to consider the predecessor's workers, based on his preference for familiar Triple M personnel and his view that new employees were needed to implement operational changes. (See discussion, *post.*) Indeed, Harris testified that on both January 18 and February 5, the dates on which the union "demands" were received, he had no positions available and no reasonable prospect of any in the foreseeable future. Hence, the "improper application" argument lacks merit.

■■ The growers next claim the record fails to support a conclusion that the refusal to hire was impelled by an antiunion purpose. We cannot agree.

■■ Of course, we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary

---

[6]The ALO refused to admit in evidence the growers' exhibit G, a "declaration" by Attorney Campagne stating the substance of his January 18 telephone conversation with Huerta. The declaration suggests that Huerta took a particularly intransigent tone in voicing the union's terms. The growers challenge the ALO's ruling and offer the declaration for substantive consideration on appeal. However, they failed to raise the admissibility of the declaration in their formal exceptions and brief filed with the Board. Hence, they waived the point (see *Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971 [157 Cal.Rptr. 476]), and we do not consider exhibit G for any purpose.

findings may seem to us equally reasonable, or even more so. (See *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 94 [84 Cal.Rptr. 113, 465 P.2d 1]; *N. L. R. B.* v. *Holly Bra of California, Inc.* (9th Cir. 1969) 405 F.2d 870, 872.) We will uphold the Board's decision if it is supported by substantial evidence on the whole record. (§ 1160.8; *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727 [175 Cal.Rptr. 626, 631 P.2d 60]; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343-346 [156 Cal.Rptr. 1, 595 P.2d 579]; see *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467, 71 S.Ct. 456].)

■ Here, as often happens, there was no direct or specific evidence that the growers' hiring policy for obtaining agricultural workers was wrongly motivated. No witness testified, for example, that Harris had vowed to avoid the UFW by any and all means. Rather, the Board inferred improper motive primarily because it did not believe Harris' alternative explanations of his conduct. Its decision must be sustained if its grounds for discrediting Harris were plausible.

■ As a rule, motive must be inferred from all the circumstances, and the Board's expertise entitles it to considerable deference in deciding that question. (E.g., *Penasquitos Village, Inc.* v. *N. L. R. B.* (9th Cir. 1977) 565 F.2d 1074, 1079; *Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 835-836 [161 Cal.Rptr. 870].) The general counsel has the burden of establishing bad motive. Yet inferences arising in law and reason may require an employer to justify his suspicious acts.

For example, *NLRB* v. *Great Dane Trailers* (1967) 388 U.S. 26 [18 L.Ed.2d 1027, 87 S.Ct. 1792] established that some employer conduct is so "inherently destructive" of employee organizational rights as to constitute a prima facie violation which the employer must explain away. Conduct of this kind "carries with it 'unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears 'its own indicia of intent.' [Citation.]" (P. 33 [18 L.Ed.2d at p. 1034].)

In such cases, the Board may find an unfair labor practice "even if the employer introduces evidence that the conduct was motivated by business considerations. . . . [¶] . . . Thus, . . . once it has been proved that the employer has engaged in discriminatory conduct which could have adversely affected employee rights . . ., the burden is upon the employer to establish that he was motivated by legitimate objectives. . . ." (P. 34 [18 L.Ed.2d at p. 1035].) If his business justifications are not "legitimate and

substantial," such conduct may constitute an unfair labor practice "without reference to intent." (*NLRB* v. *Fleetwood Trailer Co.* (1967) 389 U.S. 375, 380 [19 L.Ed.2d 614, 619, 88 S.Ct. 543].)

Wholesale replacement of union with nonunion employees has a manifest and substantial adverse impact on organizational rights. (See *Phelps Dodge Corp., supra,* 313 U.S. 177, 185 [85 L.Ed. 1271, 1278].) Arguably, therefore, the *Great Dane* analysis applies; indeed, both the Board and the parties have proceeded on the assumption that it should. (See *Columbus Janitor Service* (1971) 191 N.L.R.B. 902, 910-911; see also *Rushton & Mercier Woodworking Co.* (1973) 203 N.L.R.B. 123, 125-126, enforced (1st Cir. 1974) 502 F.2d 1160, cert. den., 419 U.S. 996 [42 L.Ed.2d 270, 95 S.Ct. 310].)

■ *Great Dane* aside, common sense supports the Board's argument that it could infer bad motive from the lack of credibility in Harris' explanations. When an employer acquires an enterprise soon after a union has won election as bargaining representative, he is bound to know that under existing law he may, by hiring new employees, be able to avoid the bargaining obligations he would otherwise inherit. (See discussion, *post.*) He has full power to employ new workers for other reasons. (*Howard Johnson Co., supra,* 417 U.S. 249, 261-262, and fn. 8 [41 L.Ed.2d 46, 56]; *Burns Security Services, supra,* 406 U.S. 272, 280-281, fn. 5, 287-288 [32 L.Ed.2d 61, 69, 73].) But the Board need not ignore his obvious incentive, when faced with a recent certification, to use his hiring authority as a means of nipping union problems in the bud.

The antiunion temptation to take such a course is likely to be much greater than in the case of an individual discharge. ■ Therefore, when all the reasons a new employer has given for replacing the union workforce with nonunion employees are found unconvincing, and the circumstances otherwise permit, the Board may be entitled to conclude that the true motive is the prohibited one. (See *Foodway of El Paso, supra,* 496 F.2d 117, 119-120; *Tri State Maintenance Corporation* v. *N. L. R. B.* (D.C.Cir. 1968) 408 F.2d 171, 174; *Shattuck Denn Mining Corp.* (*Iron King Branch*) v. *N. L. R. B.* (9th Cir. 1966) 362 F.2d 466, 470; *Columbus Janitor Service, supra,* 191 N.L.R.B. 902, 910-911.)

■ The growers raise no fundamental objection to these principles. They argue vigorously, however, that the Board had no grounds to reject Harris' "uncontradicted" statement of his legitimate business motives.

We recognize that the Board must accept "uncontradicted and unimpeached" testimony unless "there is some rational reason for disbelieving

it." (*Martori Brothers, supra,* 29 Cal.3d 721, 728.) But an interested witness' declarations of his innocent purpose are difficult to rebut directly. The Board must assess their credibility in light of all the facts.[7]

The growers first rely on Harris' statement of his established preference for employees who had already worked for him.[8] They point to several NLRB decisions suggesting that employers need not alter customary hiring practices when taking over new businesses, even if this means wholesale rejection of a predecessor's union workers. (E.g., *Industrial Catering Company* (1976) 224 N.L.R.B. 972, 978; *Crotona Service Corp.* (1972) 200 N.L.R.B. 738, 740-741; *Southline System Services* (1972) 198 N.L.R.B. 449, 452.)

The growers contend that a consistent preference for familiar workers over strangers dispels any *Great Dane*-style inference of antiunion animus. In each of the cases they cite, however, the NLRB simply credited employer assertions of good faith under all the circumstances.

For example, in *Industrial Catering,* the NLRB noted the several months' time lapse between discontinuance of cafeteria services and their resumption under a new concessioner. It also found convincing the new employer's argument that his services differed substantially from the predecessor's and that he employed rigid and standardized methods in all his cafeteria operations. (224 N.L.R.B. at p. 978.)

Evidence that an employer treats union workers just as he has treated nonunion workers in the past weighs toward a finding that there was no antiunion discrimination or animus. (E.g., *Pellegrini Bros. Wines, Inc.* (1979) 239 N.L.R.B. 1220, 1226.) Yet here the Board concluded from all

---

[7]The growers also object to the Board's failure to find that antiunion animus was a "but for" cause of Harris' refusal to hire any prior workers. (*Martori, supra,* at p. 730; see *Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 483, 97 S.Ct. 568]; *Wright Line* (1980) 251 N.L.R.B. 1083, 1089, enforced (1st Cir. 1981) 662 F.2d 899, cert. den. (1982) 455 U.S. 989 [71 L.Ed.2d 848, 102 S.Ct. 1612].) The "but for" test, however, applies to so-called "dual motive" situations in which the Board finds that *both* innocent and improper purposes were involved. Here, the Board concluded that all the innocent motives advanced were pretexts. In effect, it determined that antiunion animus was the only true cause. (*But cf.,* Jackson & Heller, *The Irrelevance of the Wright Line Debate: Returning to the Realism of Erie Resistor in Unfair Labor Practice Cases* (1983) 77 Nw.U. L.Rev. 737, 757.)

[8]On appeal, the growers have cited statutes and cases supporting an employer's right to follow a "bona fide seniority system" which does not manifest discriminatory intent. (See Civil Rights Act of 1964, tit. VII, § 703(h), 42 U.S.C.A. § 2000e-2(h); *Franks* v. *Bowman Transportation Co.* (1976) 424 U.S. 747, 757 [47 L.Ed.2d 444, 457, 96 S.Ct. 1251].) No such "seniority system" argument was raised before the Board. We reject it in any event; there was no evidence of adherence to a system granting vested seniority rights.

the evidence that an innocent preference for familiar workers was not a true reason for wholesale rejection of the NPMS employees. That determination must stand if substantially supported. It must be evaluated in light of all the justifications the growers have advanced for preferring Triple M crews.

According to Harris, his observations at the ranch convinced him that quick and drastic changes were necessary to turn it into a profitable farm. He had a longstanding relationship with Triple M through Riverbend, and it provided a ready pool of workers familiar with the methods he intended to install.

The growers also assert that here, as in his prior takeovers, Harris adhered to the "management principle" that a new operator should not hire his predecessor's employees, since they are likely to resist change. Moreover, they say, Harris wished to reward Triple M employees for their past loyalty; he had promised one crew that its members would have the first of any new work in Ventura County.

The Board saw numerous reasons for distrusting Harris' statement of his motives. First, it noted that evidence of Harris' past practice in taking over businesses was scarce, and it concerned much different entities.[9] Hence, there was little basis to conclude that he was acting consistently by preferring his own workers in this case.

Next, the Board found no logic or prudence in Harris' untested assumption that the Triple M employees were superior for his purposes. The NPMS workers were on the premises, readily available. They had long experience with the ranch's operation, while the imported Triple M personnel had none. Harris himself had never farmed such large acreage. Yet he never inquired whether any of the NPMS employees had skills he could use,[10] and he actively avoided their repeated attempts to offer themselves for work.

The Board also concluded, on conflicting evidence, that the operational changes Harris planned were not substantial. This, it suggested, undermined his asserted belief that a complete personnel turnover was necessary. Harris testified that he wished to reduce the labor force, switch from "furrow" to "drip" irrigation, change from cultivation to herbicides as a means of weed control, substitute piecework compensation for hourly wages in harvesting, and alter fruit-picking methods. However, the Board credited evidence that

---

[9] Harris had previously taken over an 80-employee citrus packing house and 3 smaller citrus farms with a total of "perhaps ten employees."

[10] Harris did hire two nonunion former NPMS managers as consultants.

the irrigation and weed-control changes were already in progress, using the NPMS workers, when Harris took over.

Moreover, said the Board, Harris could not have evaluated the Triple M employees' skills in these preharvest areas; Riverbend, as a packer, provided harvesting and pruning services for its grower customers but had not been involved in other cultivation matters.

The growers made much of Rancho Sespe's outdated pruning methods, but the Board concluded that the changes involved no extensive retraining. It is conceded that some of the workers hired had no familiarity with Harris' pruning techniques.[11]

The Board noted that, despite Harris' claims of loyalty to the Triple M employees, and of their special skills in his techniques, none had worked for Riverbend more than two years. Many were seasonal only, and some had less than three months' experience with Harris.

Under these circumstances, the Board also questioned Harris' reliance on a "management principle" of avoiding the predecessor's experienced workers. In the Board's view, blind adherence to such a principle was not a prudent alternative to ascertaining the actual qualifications of a seasoned, already-present labor pool.[12]

The growers argue that asserted motives cannot be rejected simply because they are unreasonable, since the employer can refuse to hire for any cause, good or bad, other than antiunion animus. (See, e.g., *N. L. R. B.* v. *Joseph* (9th Cir. 1979) 605 F.2d 466, 468; *National Labor Relations Board* v. *McGahey* (5th Cir. 1956) 233 F.2d 406, 412.) However, common sense suggests that the less logical a motive for business conduct, the more likely that it did not actually exist.[13] We think the Board may decide, within rea-

---

[11]This, of course, suggests Harris really had no plan to confine his hiring to workers versed in his methods. The same can be said for his testimony that, after a 30-minute refresher course in pruning, his veteran workers could "help along" their inexperienced compatriots.

[12]Rejecting a similar contention in *Columbus Janitor Service, supra,* 191 N.L.R.B. 902, the NLRB said: "[t]he apocryphal character of such claim is self-evident for the Respondent did not interview a single Allied employee to ascertain whether he or she possessed bad habits or whether he or she would adapt to the Respondent's work methods, although it knew Allied employees were available for employment." (P. 911.)

[13]The ALO rejected the "management principle" motive as a matter of law, concluding that it would always justify preferring new workers over a predecessor's union employees, to the detriment of labor policy. The Board did not adopt the ALO's analysis on this point. However, it noted that "such a management practice may conflict with the Act's policy of encouraging stable labor relations, and will frequently result in the refusal to hire former employees who are represented by a union."

son, whether an employer's asserted motives appear so trivial or illogical that they are improbable.[14]

The Board, like the ALO, was also unpersuaded by Harris' assertions that he had assured a Triple M crew first chance at any new farm work in the county. This vaguely stated promise, the Board reasoned, could not have been a serious factor in Harris' plans, since it was made in mid-1978, long before Harris had any idea he would be allowed to pick and pack the ranch's fruit. Only later did it become clear that he would have to take over farming operations in order to obtain the crops.

Moreover, Harris' testimony was confused as to places, dates, and number and names of Triple M employees to whom he spoke, undermining his general credibility and indicating a lack of warmth and loyalty toward the workers. Indeed, Harris did not know if any of the workers he addressed had ever worked for Riverbend.[15] By the time of the hearing (Apr. 1979) he had obtained from Triple M many more employees than were in the "promised" group, including 13 temporary people who had never worked for him before.[16] Again, while contrary inferences were certainly possible, the Board's analysis is supportable.

Harris argued that speedy changes were needed to enable him to meet the "burdensome" rent obligations. The Board found, however, that few changes had been made in the first three months of operation. The growers' rebuttal that little could be done in the winter months actually contradicts their assertion that the need for speed was a factor in Harris' determination.

Finally, as the Board noted, the reasons Harris gave for his actions were often irreconcilable. For example, he explained his uncooperative attitude

[14]The growers note the statements of two other farm operators that they would always prefer familiar workers in taking over a new farm, regardless of the quality of the predecessor employees. By rejecting their "management principle" defense as unreasonable, the growers say, the Board improperly disregarded this "uncontradicted expert testimony." However, the Board has considerable power in this nontechnical area to apply its experienced common sense against the formal evidence. (Cf., *Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 139-141 [181 Cal.Rptr. 732, 642 P.2d 792].)

[15]The growers point out that Harris did remember several names and suggest that passage of time between the promise and the hearing caused normal memory lapses. But the Board could infer that Harris was unlikely to forget the details of a commitment so important to him. Indeed, it would be necessary to remember the identities of the promised workers so they would be the first accommodated.

[16]Petitioners say these were temporary frost-protection workers, needed until Triple M employees already hired returned from vacation. But, as the Board notes, favoring even these temporary workers over the former Rancho Sespe personnel suggests that Harris was more interested in excluding the latter than in preferring people with whom he had a prior relationship.

toward the UFW as hostility and "confusion" about its harsh and rigid demands. He testified that individual inquiries from the NPMS workers were never received, hinting that they would have been considered. Yet he also maintained that his employment policies arose from a prior decision to follow the absolute "management principle" against hiring a predecessor's workforce. He conceded, indeed insisted, that by the time the UFW's first communication was received, all hiring had been done, and no positions were or would be available.

In sum, the Board found Harris' statement of his business justifications to be "superficial, unfounded, and contradictory" under all the circumstances. This, in the Board's view, left "only the explanation that [the growers] sought to avoid hiring employees who had already chosen the UFW as their bargaining representative."

On the whole record, we see no basis to disturb the Board's conclusion. The evidence supports its finding that Harris knew of the UFW election victory when he agreed to farm the ranch. Upon taking it over, he moved swiftly to evict the unionized employees. He provided them no opportunity to apply for work, never inquired about their qualifications, and steadfastly determined that none would be rehired, though they represented a labor pool with extensive experience in the ranch's operations. While hastily assembling his own complement of workers, he avoided the former employees' efforts, both direct and through their union, to plead their case for reinstatement. His response to the union's complaints was minimal, uncooperative, and evasive. His replacement personnel, all newcomers to the ranch, had no union affiliation. On substantial evidence, the Board concluded that the "innocent" business reasons advanced for these policies were inconsistent and incredible.

Such facts may not compel the inference that an employer acted for antiunion reasons, but they amply support it. (Compare, e.g., *Kallmann* v. *N. L. R. B.* (9th Cir. 1981) 640 F.2d 1094, 1099-1100; *N. L. R. B.* v. *Houston Distribution Serv., Inc.* (5th Cir. 1978) 573 F.2d 260, 264, cert. den., 439 U.S. 1047 [58 L.Ed.2d 705, 99 S.Ct. 722]; *Foodway of El Paso, supra,* 496 F.2d 117, 119-120; *N. L. R. B.* v. *New England Tank Industries, Inc.* (1st Cir. 1962) 302 F.2d 273, 276, cert. den., 371 U.S. 875 [9 L.Ed.2d 114, 83 S.Ct. 147]; *Piasecki Aircraft Corporation, supra,* 280 F.2d 575, 576-585.) Accordingly, the Board's determination must be upheld.

3. *Evictions.*

■ The Board found that eviction of the Rancho Sespe workers from the labor camp was a separate violation of section 1153, subdivisions (a) and

(c). When an employee is evicted from company housing following a discriminatory discharge (or refusal to hire), it may be proper to infer that the eviction was also discriminatory in purpose. (E.g., *Filice Estate Vineyards* (1978) 4 A.L.R.B. No. 81, p. 2; *W.T. Carter and Brother* (1950) 90 N.L.R.B. 2020, 2025.)

The growers introduced evidence that Harris considered maintenance of labor housing unduly expensive, wanted the land for agricultural use, and believed it best to encourage workers to maintain their own homes. There was, however, conflicting evidence on the virtues of resident labor. In any event, the Board reasoned that none of Harris' asserted reasons justified the haste with which the eviction notices were served. While conflicting inferences are possible, we see no reason to disturb its conclusions.

### 4. *Refusal to Bargain.*

■ The Board found that the growers had violated section 1153, subdivision (e), by refusing to recognize the UFW and take up the bargaining obligations of NPMS. A new owner, of course, need not recognize the certified bargaining representative of his predecessor's employees unless he is a "successor employer." (See, e.g., *Burns Security Services, supra,* 406 U.S. 272, 278-279 [32 L.Ed.2d 61, 68].)[17]

The growers note that continuity of the work force is an essential element of successorship. Since Harris hired no prior employees, they urge, they cannot be successors. But a new employer cannot avoid successorship status by a discriminatory refusal to hire the predecessor's workers. Where such conduct has occurred, continuity of the workforce will be presumed. (E.g., *Foodway of El Paso, supra,* 496 F.2d 117, 120; *K.B. & J. Young's Super Markets, Inc.* v. *N. L. R. B.* (9th Cir. 1967) 377 F.2d 463, 466, cert. den., 389 U.S. 841 [19 L.Ed.2d 105, 88 S.Ct. 71].)

Nevertheless, the growers say, there is need for separate proof that, absent the discriminatory motive, the new employer would have hired enough

---

[17]The growers' argument that ALRA sections 1153, subdivision (f) (employer may only bargain with "certified" representative) and 1156 ("certified" representative must be chosen by election in the "bargaining unit") abrogate the successorship doctrine was rejected in *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 874, 885, footnote 12 [176 Cal.Rptr. 768, 633 P.2d 964]. (See also *Highland Ranch, supra,* 29 Cal.3d 848, 861-862.) The contention has been abandoned.

of the predecessor's employees to establish continuity.[18] We find no support for such a claim. In any event, we think any necessary proof is implicit in evidence that the new employer acted to avoid union obligations.

The growers suggest that, even with continuity of labor force, they were not a successor, since they substantially altered working conditions, equipment, methods of farming, and number of permanent employees at the ranch. The Board found the "essential nature of the business" unchanged; despite the institution of new practices, it continued to grow and harvest substantially the same crops at the same location.

Successorship analysis seeks to determine whether, after a transfer of business control, the previously certified bargaining unit remains appropriate in light of employee needs and expectations. (See *Burns Security Services, supra,* 406 U.S. 272, 280 [32 L.Ed.2d 61, 68].) The test, at bottom, is whether it is proper to assume the previous unit still exists and still is represented by the union. (*N. L. R. B.* v. *Hudson River Aggregates* (2d Cir. 1981) 639 F.2d 865, 869; *N. L. R. B.* v. *Middleboro Fire Apparatus, Inc.* (1st Cir. 1978) 590 F.2d 4, 8.)

In this context, continuity of supervisory personnel, use of the same machinery and equipment, and retention of individual employee functions are important but not dispositive. Continuity of the unit's workforce, presumed in this case, is the most crucial factor. (See *Hudson River, supra,* 639 F.2d 865, 869; *Service, Hospital, etc.* v. *Cleveland Tower Hotel* (6th Cir. 1979) 606 F.2d 684, 687; *Intern. U. of Elec., Radio & Mach. Wkrs.* v. *N.L.R.B.* (D.C.Cir. 1979) 604 F.2d 689, 694; *San Clemente Ranch, supra,* 29 Cal.3d at p. 891.) The Board did not err in finding the growers to be successors.

5. *Riverbend's Opportunity to Be Heard.*

At a prehearing conference, the ALO granted Riverbend's motion to be dismissed as a respondent. Riverbend argues that it was unfairly surprised and denied due process when, without notice on the last day of hearing, the general counsel was allowed to amend the complaint to reinclude Riverbend as a "joint employer" subject to any remedial order. Riverbend

---

[18]Federal precedent requires for "workforce continuity" that a majority of the new owner's employees worked for the predecessor. (*Burns Security Services, supra,* 406 U.S. 272, 281 [32 L.Ed.2d 61, 69]; *Saks & Co.* v. *N. L. R. B.* (2d Cir. 1980) 634 F.2d 681, 685.) In *San Clemente Ranch, supra,* 29 Cal.3d 847, we held that the fluctuating nature of agricultural employment requires a more flexible approach to workforce continuity. (P. 891.) The growers suggest the federal rule should apply here since both the former and current employees are permanent. The issue is moot, however, in discriminatory-refusal-to-hire cases.

urges the case should be remanded for a full hearing on its joint-employer status. We disagree.

The original and first amended complaints had named Riverbend as a respondent, asserting that Rivcom was its wholly owned subsidiary and agent. They also had alleged that joint-employer status existed between Newport and Riverbend, and between Newport and Rivcom. However, it was never recited that Riverbend and Rivcom were directly related as joint employers.

When the ALO granted Riverbend's motion to dismiss, he ordered Riverbend's name removed from the complaint's caption and from its prayer for relief. The original joint-employer allegations remained in the body of the pleading.

We reject the Board's contention that these remaining boilerplate allegations were enough to place Riverbend on notice after its dismissal that it was potentially liable as a joint employer. The clear purpose of the ALO's prehearing order was to drop Riverbend from the complaint on grounds the allegations against it were not sufficient to state a claim (see discussion, *post*). On the basis of the pleadings alone, Riverbend was entitled to believe it had been dismissed from the proceeding.

We are concerned about the timing of the later amendment. However, we conclude that it did not deny Riverbend due process. Harris is president of both Rivcom and Riverbend, and he was present throughout the proceedings. So were one or more members of Campagne's law firm, which acted on Riverbend's behalf throughout.

On the third day of the hearing, Harris was called as an adverse witness by the general counsel and was examined at length on the relationship between Riverbend, Rivcom, and Triple M. After a recess, the ALO broached the question of Riverbend's status. He advised Campagne that he had dismissed Riverbend because allegations of a parent-subsidiary relationship, standing alone, were insufficient to saddle that company with responsibility for Rivcom's unfair practices. However, he said, "I'd like you to on the record be aware that in my mind testimony has opened up serious question as to whether Riverbend . . . may also be an employer, an agricultural employer under the Act." Campagne responded by reiterating his argument that Triple M, not Riverbend, employed the workers used in Rivcom's farming operation.

On the last day of the hearing, after both sides had rested, the Board's counsel sought several amendments to conform to proof, including a new

allegation that Riverbend and Rivcom, by virtue of their close operational and labor relationship, were joint employers of the Rivcom workers. Campagne argued on Riverbend's behalf that the evidence failed to show joint-employer status, but he did not complain that amendment of the complaint *in this respect* constituted prejudicial surprise to Riverbend. Contrary to Riverbend's claim on appeal, he never asked that the hearing be continued or reopened so Riverbend could present further evidence on the joint-employer issue.[19]

Indeed, the due process-surprise argument was not raised in the growers' joint posthearing brief to the ALO. Though it was included among the 238 formal exceptions presented to the Board, the question was not briefed at that level. Nor was it asserted in the Court of Appeal until oral argument, at which time that court requested supplemental briefing.

Riverbend still claims it would have litigated the joint-employer issue more fully had it known it remained potentially liable. Yet it has never suggested any specific, material new evidence it would have adduced had the hearing been continued or reopened.

Amendments to conform to proof are liberally allowed unless they prejudice the opposing party. (Code Civ. Proc., § 469.) Since no prejudice is shown from the amendment here, it was well within the Board's discretion to allow the amendment and, upon finding joint-employer status, to extend its remedial order to Riverbend. (*Royal Typewriter Co.* v. *N. L. R. B.* (8th Cir. 1976) 533 F.2d 1030, 1043-1044; see also *N. L. R. B.* v. *Jordan Bus Company* (10th Cir. 1967) 380 F.2d 219, 222-223; *Hillside Manor Health Related Facility* (1981) 257 N.L.R.B. 981, 984-985, enforced (1st Cir. 1982) 697 F.2d 294.)

6. *Employer Status.*

 The growers contend there is no substantial evidence that either is the statutory employer of the ranch workers. They first urge that Triple M is "the" true employer. Labor contractors, of course, are excluded from employer status by the ALRA. (§ 1140.4, subd. (c); see discussion, *post.*)

---

[19]Campagne did ask the ALO for a continuance so he could produce additional evidence on the proposed make-whole remedy. (See discussion *post.*) But he never mentioned the *joint-employer* issue as one he needed more time to meet.

The growers assert, however, that Triple M functions as a "custom harvester" and may be deemed an employer.[20]

The Board found the contrary. It acknowledged that Triple M had some characteristics of a custom harvester; it provided equipment and hauling services, set wages, and apparently had hiring and firing authority.[21] However, the Board concluded on conflicting evidence that Harris had primary control over day-to-day farming operations. Most significantly, it determined that Rivcom and Riverbend, rather than Triple M, had "the substantial long-term interest in the ongoing agricultural operation" which made it appropriate to fix employer responsibilities on them. (See *Corona College Heights Orange and Lemon Association* (1979) 5 A.L.R.B. No. 15, pp. 11-12.)

We agree. The ALRA expressly excludes both a "farm labor contractor" and "any [other] person supplying agricultural workers to an employer" from the otherwise expansive definition of "agricultural employers" subject to the Act. A farm operator who "engages" the labor supplier is "deemed the [statutory] employer for all purposes" of the statute. (§ 1140.4, subd. (c).)

In these provisions, the ALRA's drafters directly addressed the widespread practice of obtaining field workers from intermediate suppliers who retain ostensible control over hiring, firing, wages, and working conditions. The Act sought to bypass that intermediate employment relationship and to "establish [an] 'industrial' bargaining unit scheme, with collective bargaining directly between growers and unions." (*Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 323 [172 Cal.Rptr. 720, 625 P.2d 263].) It also confirmed farm operators' direct responsibility for unlawful interference with employees' organizational rights. (*Id.,* at p. 326.)

The Board developed the "custom harvester" distinction in response to arguments by certain labor suppliers that they were entirely excluded from statutory responsibility as mere labor contractors. No decision holds, how-

---

[20]Typically, a custom harvester not only contracts to furnish labor, but assumes more complete responsibility for harvesting services, including provision of equipment and hauling. His compensation is usually an overall contract rate not directly pegged to labor costs. He generally retains control over hiring, firing, and details of work management. (See *Jack Stowells, Jr.* (1977) 3 A.L.R.B. No. 93, pp. 2-3; *Napa Valley Vineyards Co.* (1977) 3 A.L.R.B. No. 22, pp. 9-11; *Kotchevar Brothers* (1976) 2 A.L.R.B. No. 45, pp. 6-7.)

[21]The Board found "no evidence" that Harris had power to hire, fire, or discipline. Actually, though Harris denied it, his resident ranch supervisor testified that Harris and Benny Martinez, owner of Triple M, shared that authority.

ever, that a custom harvester is the *sole* employer of any workers it furnishes. Any such result would undermine the statutory goal of fixing labor relations responsibility directly on farm operators. Thus, any assumption that Triple M acted as a custom harvester at Rivcom Ranch, and was therefore an employer of the workers there, does not preclude a finding that Rivcom and Riverbend, the ranch's operators, were *also* employers of those workers for purposes of the Act. The Board has reached the correct conclusion.

 Riverbend claims there is no basis to conclude it is a "joint employer" with Rivcom. There was ample evidence, however, that for labor-relations purposes, Rivcom and Riverbend operated as a single enterprise. (*N. L. R. B.* v. *Triumph Curing Ctr.* (9th Cir. 1978) 571 F.2d 462, 468; *Abatti Farms, Inc.* (1977) 3 A.L.R.B. No. 83 (ALO Dec., pp. 10-18).) Harris is principal owner of Riverbend, which owns Rivcom. For the most part, the ranch serves as the integrated farming arm of Riverbend's marketing operation; Rivcom cultivates citrus which Riverbend harvests, hauls, packs, sells, and ships. Harris makes the day-to-day management decisions for both entities.[22] He helped select, and he largely directs, the Triple M workers used by both Rivcom and Riverbend. There was evidence that Triple M workers have been transferred back and forth to both Rivcom and Riverbend payrolls as needed.

 Riverbend's (and Rivcom's) lack of control over wages and hours of the Triple M workers is not fatal to a finding of employer status under the ALRA. That contract labor suppliers have traditionally retained those functions in California agriculture does not insulate the growers who engage them. (*Abatti Farms, Inc., supra,* 3 A.L.R.B. No. 83 (ALO Dec., pp. 10-18; see *Vista Verde Farms, supra,* 29 Cal.3d 307, 323.) The Board's finding of joint-employer status is upheld.[23]

---

[22]Riverbend says its relationship with Rivcom is no different from its tie to other "outside growers" for whom it also provides harvesting, hauling, and packing services. That ignores the common ownership and management of the two companies, and the evidence that Rivcom was principally intended as a "captive grower" of Riverbend, an assured source of fruit.

[23]The growers' opening brief on appeal argued that the case must be remanded since the Board failed to determine the appropriate bargaining unit after the change of ownership. (See § 1156.2; cf., *Peter Kiewit Sons' Co.* (1977) 231 N.L.R.B. 76, 78.) The Board's response urged that this, as well as several other contentions, had been waived because they were not fairly raised in the filed exceptions to the ALO's decision. (See *Butte View Farms, supra,* 95 Cal.App.3d 961, 971.)

The reply brief submitted by the growers denied waiver as to the other challenged arguments but did not mention this one. Our own review of the filed exceptions persuades us the issue was not preserved at the administrative level and is therefore waived. We assume it has been abandoned.

In any event, a determination of successorship includes an implicit finding that the pre-

### 7. *Triple M's Interest in the Remedial Order.*

 The remedial order directs Rivcom and Riverbend to replace the employees now working at Rivcom Ranch with UFW workers displaced by the discriminatory refusal to hire. Triple M was not a party before the Board. In its separate petition for review (§ 1160.8), Triple M argues that it is directly affected by the reinstatement requirement, since it is the contractual source of the current workers who are subject to replacement. Hence, Triple M suggests, it was an indispensable party; without its participation, the Board lacked jurisdiction to make a reinstatement order. The contention lacks merit.

Triple M cites NLRA precedent which suggests that the Board may not interfere with contractual relations between a party and a nonparty unless the contract arises directly from an unfair labor practice and is void as a matter of statutory policy. (Compare, e.g., *Nat. Licorice Co.* v. *Labor Board* (1940) 309 U.S. 350, 363-366 [84 L.Ed. 799, 810, 811, 60 S.Ct. 569], with *Edison Co.* v. *Labor Board* (1938) 305 U.S. 197, 231-239 [83 L.Ed. 126, 141-145, 59 S.Ct. 206].) Recent NLRB decisions indicate the Board's reluctance to order abandonment of an employer's current labor-supply contract and reinstitution of another previously terminated, unless both old and new contractors have appeared and argued. (Compare *Hillside Manor Health Related Facility, supra,* 257 N.L.R.B. 981, 984-985, with *Mobil Oil Corp.* (1975) 219 N.L.R.B. 511, 512, enforcement denied on other grounds, *Alaska Roughnecks & Drillers Ass'n* v. *N. L. R. B.* (9th Cir. 1977) 555 F.2d 732, cert. den. (1978) 434 U.S. 1069 [55 L.Ed.2d 771, 98 S.Ct. 1250].)

As noted, however, our farm labor law expressly discounts the widespread use of labor contractors by California growers. It makes the latter the "employers" for "all [labor relations] purposes" of agricultural workers supplied them by the former. (§ 1140.4, subd. (c), *supra;* see *Vista Verde Farms, supra,* 29 Cal.3d 307, 323-324.)

Any of the ALRB's remedial powers, including the power to order direct bargaining between grower and union, are likely to affect intermediate relationships between growers and contractors, and between contractors and workers. If the contractors were indispensable parties in every such case, the Board's power to fashion the remedies contemplated by the Act would suffer grievous harm.

---

vious bargaining unit remains appropriate. The Board accepted the ALO's decision to substitute Rivcom/Riverbend for NPMS on the prior certification order covering the ranch. There is no merit to petitioners' argument that the appropriate unit was not determined.

It follows that a contractor's interests should not thwart the Board's enforcement of labor policy against the grower, whom the ALRA recognizes as the true employer. (Cf., *Nat. Licorice Co., supra,* 309 U.S. at pp. 362-366 [84 L.Ed. at pp. 809-812].) Accordingly, the general counsel's failure to include the contractor as a party does not necessarily deprive the Board of jurisdiction to impose a remedy which may affect the contractor's relationship with both grower and workers.

Of course, the contractor may seek to intervene (§ 1160.2) and denial of intervention might sometimes be an abuse of discretion. Triple M, however, did not seek to participate in the proceedings below,[24] and it makes no serious showing of the interests it deems prejudiced. We conclude that the failure to include Triple M as a party before the Board does not invalidate the hiring order.

*8. Remedies.*

The Board's remedial order includes a broad cease-and-desist provision, as well as awards of reinstatement, backpay, and "make-whole" reparations for the growers' refusal to bargain with the union. ▆▆ ▆▆ ▆▆ ▆▆ ▆▆ Among other things, the Board ordered the growers to negotiate with the UFW and directed them not to discourage union membership by "attempting to evict, or evicting" the NPMS workers from housing "provided them as a condition of their employment by NPMS."[25]

---

[24]Triple M makes the startling assertion that it had no actual notice of the hearing before the ALO. It has a long, close association with Harris, Riverbend, and Rivcom, and has always been the source of the challenged workforce at Rivcom Ranch. Its relationship to Rivcom and Riverbend, and the status of the employees on its payroll, were central issues. Juan Batista, Triple M's crew leader at the ranch, testified at the hearing. We are not persuaded by counsel's assertion at oral argument that because Benny Martinez, Triple M's owner, was absent from the state during the hearing, Triple M had no actual knowledge of the proceedings.

[25]We do not interpret the Board's order as an absolute command to maintain the labor camp permanently. The amended complaint charged and the Board found, among other things, that petitioners had used the eviction notices *as a form of antiunion discrimination* (§ 1153, subds. (a), (c)). The cease-and-desist order is directed only at evictions in furtherance of the antiunion policy. The Board also directed petitioners to bargain in good faith with the UFW. Thus, while petitioners may not unilaterally alter the "conditions of employment" by closing the camp, they may, of course, bargain about the future of employee housing on the ranch.

Rivcom cites a recent United States Supreme Court case, *Bill Johnson's Restaurants, Inc.* v. *NLRB* (1983) — U.S. — [76 L.Ed.2d 277, 103 S.Ct. 2161], for the proposition that the Board may not prohibit "retaliatory" unlawful detainer actions. *Bill Johnson's* holds that when an employer's suit is *well-founded* and asserts rights *not preempted* by the labor laws, it may not be enjoined as an unfair labor practice *solely* on the ground that its *motive* is to retaliate against protected activity. (Pp. —, and fn. 5 [76 L.Ed.2d, pp. 285, 287-289].) However, labor statutes and regulations limit an employer's substantive rights under general

■ The growers raise several objections. They first contend that the backpay award is overbroad, since it extends beyond actual wages lost to "expenses" and interest. But award of the costs of seeking or holding interim employment, and of interest, is a well-established NLRB practice. (*Southern Household Products* (1973) 203 N.L.R.B. 881, 883; *Isis Plumbing & Heating Co.* (1962) 138 N.L.R.B. 716, 719-720, enforcement den. on other grounds (9th Cir. 1963) 322 F.2d 913.)

■ Citing *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1 [160 Cal.Rptr. 710, 603 P.2d 1306], the growers next urge that the Board erred by ordering them to make the NPMS employees whole for imputed bargaining losses (see *Highland Ranch, supra,* 29 Cal.3d 848, 866, fn. 7), since there was no finding that their refusal to bargain was in bad faith.

Our statute, unlike the NLRA, expressly empowers the Board to order the make-whole remedy for an employer's bad-faith refusal to bargain. (§ 1160.3.) However, this court held in *J.R. Norton* that the remedy may not be used when the employer commits a "technical" refusal to bargain as the only means to obtain judicial review of a colorable, good-faith challenge to union certification. If a sincere but unsuccessful challenge exposed the employer to liability for all gains prompt bargaining might have produced, said the court, meritorious challenges, which serve the Act's purposes, would be deterred. (26 Cal.3d at pp. 27-37.)

Here, the Board found on substantial evidence that the growers attempted to evade the bargaining duties of a successor by adopting an illegal tactic— purposeful discrimination in hiring on the basis of union affiliation. In other words, they acted in bad faith in creating their claim of lack of successorship. No purpose of the ALRA would be served by insulating them from

law, including his right to exclude others from his property. (See, e.g., *S.P. Growers Assn.* v. *Rodriguez* (1976) 17 Cal.3d 719, 726-728 [131 Cal.Rptr. 761, 552 P.2d 721]; *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392, 419-421.) And where a dispute concerns activities arguably protected or prohibited by the labor relations statute, the Board, not the courts, has primary jurisdiction. (See *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 244-245 [3 L.Ed.2d 775, 782-783, 79 S.Ct. 773]; *Vargas* v. *Municipal Court* (1978) 22 Cal.3d 902, 910-913 [150 Cal.Rptr. 918, 587 P.2d 714].) An employer has no right to discharge his resident workers, then commence eviction procedures, when his purpose is to combat or punish activities protected by the ALRA. (*Vargas, supra,* at p. 914; *S.P. Growers, supra,* at p. 725; see Code Civ. Proc., § 1161, subd. 1.) As a matter of law, retaliatory suits of that kind have no "reasonable basis" (compare *Bill Johnson's, supra*), and their use is an unfair practice the Board may enjoin. Moreover, the Board may obviously prohibit an employer's efforts to evict employees from housing provided as a "condition of employment" without first bargaining about the change with the employees' certified bargaining representative. (§§ 1153, subd. (e), 1155.2, subd. (a), *supra.*)

responsibility for the losses caused by their unlawful failure to bargain. No *J.R. Norton* remand is necessary.[26]

██ The growers also urge that the reinstatement, backpay, make-whole, and no-eviction orders should not extend to all the former NPMS employees. Since the record establishes the ranch's reduced labor needs, they argue, we must assume many of the NPMS workers would not have been rehired in any event. (See, e.g., *Castleman & Bates, Inc.* (1977) 228 N.L.R.B. 1504, 1507-1508; *Rogers Furniture Sales, Inc.* (1974) 213 N.L.R.B. 834, 835-836.)[27]

The Board recognized that Rivcom's needs might not accommodate all the former NPMS workers. It directed that those who could not be reinstated immediately be placed on a nondiscriminatory preferential-hiring list approved by the regional director. It then fashioned an order compensating losses "sustained by" the employees "as the result" of the refusal to bargain and "suffered" by "each of the employees . . . as a result of Respondents' unlawful refusal to hire them, . . ."

Under the circumstances, we construe the order as self-limited to losses *directly* arising *from the unlawful conduct.* That interpretation excludes those former employees who would not have been rehired even under a legitimate hiring policy. ██ ██ ██ ██ The identities of the excluded workers may be determined at a subsequent compliance hearing. (*Kawano,*

---

[26]The growers cite *San Clemente Ranch, supra,* for the proposition that *J.R. Norton* applies to successorship cases as well as those involving certification. (See 29 Cal.3d 874, 883, fn. 9.) But this case, unlike *San Clemente Ranch,* involves charges and findings that the growers used unlawful means to avoid successorship status. That establishes the necessary element of bad faith.

[27]In a "request for judicial notice" filed well after oral argument in this court, Rivcom alerts us to a February 1982 case, *N.L.R.B. v. Sure-Tan, Inc.* (7th Cir. 1982) 672 F.2d 592, rehearing denied, 677 F.2d 584, which held that a reinstatement order applied to illegal aliens granted "voluntary departure" from the United States (see 8 U.S.C.A. § 1254(e)) only if their subsequent return and attempt to work is lawful under the immigration statutes. *Sure-Tan* also ruled that such departed aliens were entitled to backpay only for the period they would have remained employed and undetected by the INS absent the employer's discriminatory conduct; six months, said the court, was a "reasonable assumption." (P. 606.)

Rivcom now claims that the ALO improperly cut off its attempt to inquire about the alien status of an NPMS employee who testified for the Board. Noting that certiorari has been granted in *Sure-Tan* (1983) — U.S. — [75 L.Ed.2d 492, 103 S.Ct. 1270], Rivcom urges us to postpone our decision in this long-pending matter until the United States Supreme Court resolves the illegal-alien issue. We decline to do so. Petitioners never pursued their objection beyond the ALO hearing. They did not raise it before the Board, and they failed to call *Sure-Tan* to the Court of Appeal's attention in the eight subsequent months this case remained pending there. They neglected to mention it to us until July 1983, a year and a half after the Seventh Circuit's opinion was filed. Under the circumstances, petitioners have waived any claim based on illegal alienage.

*Inc., supra,* 4 A.L.R.B. No. 104, p. 18.)[28] We caution, however, that the eviction ban remains in place as to *all* the workers now living there until the identities of those who are entitled to reinstatement are determined. ■■ ■■■■ (But see discussion *post.*)[29]

## 9. *Housing Issues.*

■■ Finally, the growers seek modification of the no-eviction provision of the Board's order in light of outside proceedings affecting the labor camp. They ask us to take judicial notice of materials which suggest that in 1980, Ventura County condemned the camp as unsafe and uninhabitable and posted notices warning that occupancy is unlawful.[30] A June 1980 superior court injunction, which ordered Rivcom and Newport (owner of the ranch) to make specified repairs, is pending on appeal.[31]

---

[28]The growers argue that the NPMS payroll records introduced to establish the identities of the displaced workers do not meet the "business record" requirements of Evidence Code sections 1271, 1561, and 1562. They suggest that the affidavit of NPMS' custodian of records contained insufficient foundational facts to authenticate the documents. There is no contention that the custodian was required to testify personally. (Compare testimonial requirements of § 1271 with affidavit requirements of § 1561.)

In the growers' view, the affidavit fails to state that the records were prepared in the "ordinary" or "regular" course of business "at or near the time of the act, condition, or event" (§§ 1271, subds. (a), (b), 1561, subd. (a)(3)) and does not show the "mode of preparation" so as to establish trustworthiness. (§ 1271, subds. (c), (d).) But the custodian declares that the records were provided in response to a subpoena seeking the identities of Rancho Sespe workers "during the payroll period immediately preceding January 16, 1979." According to her affidavit, they were prepared in the "normal" course of business and are "the payroll records used and relied upon by [NPMS] in paying the employees who worked at Rancho Sespe and . . . to comply with various wage payment laws." As such, they necessarily were up-to-date employee records, and NPMS' reliance on them amply establishes their trustworthiness. They were properly admitted. (See *People* v. *Williams* (1973) 36 Cal.App.3d 262, 274-275 [111 Cal.Rptr. 378].)

[29]The growers argue that Triple M workers already hired by January 16 should be deducted from the positions deemed available on that date for purposes of reinstatement. To the extent this is a concession that some, but not all, available positions had been filled by the time the NPMS employees tried to apply for work, it is inconsistent with assertions elsewhere that *all* hiring had been completed on that date. In any event, the Board concluded that Harris' hiring policies were *solely* motivated by the desire to avoid unionization. Hence, the Board concluded that all jobs on the ranch should be available to the NPMS discriminatees.

The growers also contend that the NPMS workers waived their reinstatement and backpay rights by delaying their applications until after the positions had already been filled. The applications were timely by any reasonable test. They were made within two days after Harris' takeover, despite the failure to provide any application procedure. In any event, they would have been futile even if made instantaneously. There was no waiver.

[30]According to the notices, the dangerous conditions include substandard gas piping and overflowing sewage from septic tanks.

[31]The superior court injunction apparently was intended to make the camp habitable pending completion of the ALRB proceeding.

The growers have also obtained a Ventura County unlawful detainer judgment against the labor camp residents. We have stayed enforcement of the judgment pending resolution of this action. (See *Vargas, supra,* 22 Cal.3d at pp. 915-916.)[32]

The Board's ban on eviction, the growers urge, conflicts with the property's condemned status. They contend that section 1103, subdivision (a) of the Uniform Housing Code permits them to abate a structural nuisance "immediately dangerous to life, limb, property, or safety of the public or occupants" by abandoning rather than repairing it.[33]

Subdivision (a)(2) of section 1103 only provides that immediately dangerous premises "shall be ordered vacated." It grants no paramount right to let the housing become unsafe in order to avoid a duly entered ALRB order preventing discriminatory evictions. Were we to agree with the growers' theory, employer-landlords would have an easy means of evicting workers who are not wanted because they have exercised organizational rights. (Cf., *Vargas, supra,* 22 Cal.3d 902, 915; *S.P. Growers, supra,* 17 Cal.3d at p. 725.) Such conduct is repugnant to the Act and to public policy.

On the other hand, the Board concedes that its order runs only against the growers and does not prevent the county from taking actions immediately necessary under state and county law to protect life and limb. Those actions may include appropriately obtained and properly enforced orders to vacate the camp during an immediate peril to health or safety.

Any such action, however, can have no collateral estoppel or res judicata effect on the Board's order. (*Vargas, supra,* 22 Cal.3d at p. 916.) That order implicitly includes the command to maintain the housing in habitable condition at least until the growers reach agreement or good-faith impasse with the union about its future. (*Ante,* fn. 24.) In any enforcement proceeding (see § 1160.8), they may face a heavy burden in showing that an eviction required by health or safety hazards on the property was not the result of their efforts to avoid the Board's directive.[34]

---

[32]We have, however, permitted appeal to proceed in the Appellate Department of the Ventura Superior Court.

The growers also sought mandate to compel the county sheriff to arrest and evict the residents as a consequence of the condemnation. That effort was unsuccessful, and the sheriff, apparently in deference to the ALRB order, has declined to remove them.

[33]The Uniform Housing Code, published by the quasi-official International Conference of Building Officials, forms the basis for housing standards adopted by the state Commission on Housing and Community Development. (Health & Saf. Code, § 17922, subd. (a)(2).)

[34]Our comments assume without deciding that the events represented by the documents the growers offer are true. Hence, there is no need to take judicial notice of them, and the motion for judicial notice is denied.

10. *Conclusion.*

Petitioners' challenges to the Board's decision and order lack merit. Let a decree issue enforcing the order of the Board in accordance with the views expressed in this opinion.

Broussard, Acting C. J., Mosk, J., Kaus, J., Reynoso, J., and Spencer, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent.

My review of the record in this case convinces me that the Agricultural Labor Relations Board (Board) failed to give proper credence to the *unimpeached and uncontradicted* testimony of Larry Harris, president of petitioner Riverbend Farms. (See *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 728 [175 Cal.Rptr. 626, 631 P.2d 60].) Harris' testimony demonstrated that petitioners had legitimate and substantial business justifications for replacing the employees of the *unprofitable* predecessor grower, NPMS. Accordingly, the Board erred in rejecting Harris' justifications as "superficial, unfounded and contradictory." There was absolutely *no* evidence that petitioners' actions were prompted by any antiunion motive.

I will not repeat the evidentiary facts which disclosed petitioners' justifications as most of those facts are described in the majority opinion. Because the factual issues raised herein are of no legal importance to anyone but the parties to this litigation, a hearing in this case was improvidently granted, being unnecessary to secure "uniformity of decision" or to settle "important questions of law." (Rule 29(a), Cal. Rules of Court; see *Martori Brothers, supra,* 29 Cal.3d at pp. 731-732 [conc. opn. by Newman, J.].)

I would vacate and set aside the Board's order.

Petitioners' applications for a rehearing were denied November 16, 1983. Bird, C. J., did not participate therein. Richardson, J., was of the opinion that the applications should be granted.

---

*Assigned by the Chairperson of the Judicial Council.