**CONNECTICUT DISTRIBUTORS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 376, 970, Dockets 81–4079, 81–4143.**

United States Court of Appeals, Second Circuit.

Argued March 25, 1982.

Decided June 4, 1982.

Burton Kainen, Siegel, O'Connor & Kainen, P. C., Hartford, Conn. (Diana Garfield, Hartford, Conn., of counsel), for petitioner.

Barbara G. Gehring, Atty., N.L.R.B., Washington, D. C. (Howard E. Perlstein, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., of counsel), for respondent.

Before FEINBERG, Chief Judge, and MANSFIELD, and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Connecticut Distributors, Inc., seeks review of, and the National Labor Relations Board seeks to enforce, an order based on the company's supposed violations of sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1), in promising benefits to its employees, circulating disaffection petitions, and withdrawing and withholding recognition, thereby converting an economic strike into an unfair labor practice strike with resultant violations of sections 8(a)(3) and (1), *id.* §§ 158(a)(3) and (1). The Board's decision and order, issued on May 1, 1981, is reported at 255 N.L.R.B. No. 170. We question the

Board's finding that the company's dispatcher, Anthony Capasso, who did the promising of benefits and circulating of decertification petitions, was a supervisor. Our holding, however, is that even if Capasso was a supervisor the company was not responsible for his actions, in which it did not participate. We accordingly deny enforcement.

Capasso had been a company employee, member of the bargaining unit, and union member for eighteen years. During an economic strike in September 1978, Capasso asked company comptroller Stanley Block to recommend a labor lawyer because many of the employees were dissatisfied with the union. Block gave Capasso the names of four attorneys, one of whom Capasso contacted for information about decertification procedures. This attorney had no prior or present association with the company. Capasso thereafter circulated an anti-union petition. He told the employees that the company president would never negotiate further with the union and that if they ended the strike and left the union, the company would give them the same wages and benefits that had previously been offered and rejected. A majority of the employees signed the petition, but when several expressed reluctance to go through with the petition, Capasso circulated a second petition at a gathering at another employee's home. During the gathering Capasso told the employees that the decertification efforts "had the blessing" of company comptroller Block. A majority also signed this petition, which was then brought to the company's attention. There was no evidence that the company knew of either petition before this, or that it was at any relevant time aware that Capasso had circulated the petitions.

Using the second petition as evidence of good-faith doubt that the union enjoyed majority support, the company filed a decertification petition with the Board. The union countered with an unfair labor practice charge. Based on the Board's advice to the company that Capasso was a supervisor and had circulated the anti-union petition, the company withdrew its decertification

petition and unfair labor practice charge and resumed bargaining. At about the same time another employee circulated another anti-union petition, obtaining signatures by a majority of employees. The company filed another decertification petition with the Board, and thereafter refused to bargain with the union or to reinstate striking employees.

The Board, adopting the findings of the administrative law judge who heard the case, found that Capasso was a supervisor and that the company was responsible for his circulation of the petitions. This was found to be a violation of sections 8(a)(5) and (1), as was the reliance on the second petition as a basis for good-faith doubt about the union's majority status. The Board ruled that these violations converted the economic strike into an unfair labor practice strike, so that the company's refusal to reinstate the employees violated sections 8(a)(3) and (1). The employees' third petition did not provide the company with good-faith doubt, the Board determined, because it was tainted by Capasso's involvement with the first two petitions.

If Capasso were not a supervisor, the Board's argument that the company was responsible for the anti-union petition would be frail at best. The Board found that Capasso was a supervisor because of his (and his assistant dispatchers') authority to hire employees for temporary and casual work, decide which casual employees to call for work, change drivers' routes, and grant time off for personal reasons. Because the permanent work list was made up from the casuals who worked 150 days within a twelve-month period, the Board found that the dispatchers, by virtue of their other authority, also had the power of "effective recommendation."

An employee is a supervisor within the meaning of section 2(11) if he exercises various kinds of authority in a manner that "is not of a merely routine or clerical nature, but requires the use of independent judgment." 29 U.S.C. § 152(11). The Board's determination of supervisory status

is entitled to "special weight." *See J. J. Newberry Co. v. NLRB*, 645 F.2d 148, 154 (2d Cir. 1981); *Amalgamated Local Union 355 v. NLRB*, 481 F.2d 996, 999–1000 (2d Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973). We nevertheless doubt that Capasso's role, even in those matters the Board relies upon, can fairly be characterized as requiring the kind of "independent judgment" to which the statute refers.

Capasso's duties were of an "essentially routine nature," like those of the dispatchers in *Spector Freight System, Inc.*, 216 N.L.R.B. 551, 554 (1975). The warehouse operated on the basis of a union contract, various computer printouts (as for driver assignments), and office memoranda (as for daily delivery schedules), requiring only minimal, routine exercises of discretion. Even the load limits of each truck (and accordingly the number of stops and people assigned) were dictated by the collective bargaining agreement. And as the term "dispatcher" suggests, most of the employees were out on the road each day making deliveries. Capasso had authority to make only minor deviations in procedure, as when there was a delivery shortage, no payment on a C.O.D. delivery, or a request by an employee to leave work early or report late. Capasso's authority with respect to hiring was also minimal. In short, it is far from clear that the Board's finding that Capasso was a supervisor is supported by substantial evidence.

Even assuming Capasso's duties were supervisory, however, the Board erred in saddling the company with responsibility for his anti-union efforts. The cases of *Montgomery Ward & Co.*, 115 N.L.R.B. 645, 647 (1956), *enforced*, 242 F.2d 497 (2d Cir.), *cert. denied*, 355 U.S. 829, 48 S.Ct. 40, 2 L.Ed.2d 41 (1957); and *Nazareth Regional High School v. NLRB*, 549 F.2d 873, 883–84 (2d Cir. 1977), hold that when a supervisor is a member of the union the company is responsible for his circulation of anti-union petitions only if it encouraged, authorized, or ratified—in other words affirmatively participated in—the supervisor's activities.[1] Applying the *Montgomery Ward* standard to the facts here, the Board's decision is unsupportable. The Board points to only two facts suggesting company participation: (1) the company gave Capasso the names of four lawyers and (2) the company filed its decertification petition the same day it received the employees' second petition. In our view this is insufficient to show company complicity in Capasso's circulation of the petition. The four lawyers were independent and the Board nowhere suggests that the company's referral was improper. Nor does the company's immediate filing of the decertification petition constitute participation in the circulation of the anti-union petition, which had been completed without company awareness, much less encouragement, before the company received and acted upon it. The Board's assertion that the immediate filing condoned Capasso's action may be accurate, but it does not prove that the employer played any role in securing the employees' signatures. Furthermore, the Board is disingenuous in criticizing the company for not investigating the circumstances surrounding the petition to determine if the union actually enjoyed majority support. Such an investigation, in and of itself, might well have been the basis for an unfair labor practice charge.

Accordingly, even if Capasso were a supervisor, his circulation of the petitions cannot be attributed to the company. As a result the company could rely on the petition for good-faith doubt about the union's majority status, and the Board's other disputed findings topple.

Review granted; enforcement denied.

---

1. The Board argues for a different standard, under which company involvement would be evidenced by the employees' perception that the employee circulating the decertification petition had "management's blessing," which the Board claims was the case here. This standard is foreclosed by *Montgomery Ward* and *Nazareth*, however, which refer to an objective test of affirmative company participation, rather than the subjective analysis the Board proposes.