100

[Civ. No. 6872. Fifth Dist. Jan. 24, 1984.]

SUPERIOR FARMING COMPANY, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
GUADALUPE ALVAREZ et al., Real Parties in Interest.

COUNSEL

Quinlan, Kershaw, Fanucchi & Hoffman and William A. Quinlan for Petitioner.

Manuel M. Medeiros, Daniel G. Stone, Suzanne Vaupel and Nancy C. Smith for Respondent.

No appearance for Real Parties in Interest.

Dianna Lyons, Federico G. Chavez, Ellen Eggers, Daniel A. Garcia, Ira Gottlieb and Wendy Sones as Amici Curiae on behalf of Real Parties in Interest.

OPINION

**HAMLIN, J.**—Superior Farming Company, Inc. (Superior) petitions for review of a decision of the Agricultural Labor Relations Board (Board) that Superior committed an unfair labor practice in violation of section 1153, subdivision (a), of the Agricultural Labor Relations Act of 1975 (ALRA or Act) (Lab. Code, § 1140 et seq.)[1] by discharging members of a harvesting crew because of their protest against Superior's wage rates.

Guadalupe Gutierrez Zacarias filed the unfair labor practice charge with the Board on June 12, 1979. Following an investigation, the Board's Fresno regional director issued a complaint against Superior, alleging Superior violated section 1153, subdivision (a), by discharging Zacarias and his harvesting crew because they had engaged in protected concerted activity. An administrative law officer (ALO) heard the complaint and recommended findings that the crew had not been terminated and that, because Zacarias was not a "supervisor" within the meaning of the Act, his actions were not imputable to Superior. The Board's general counsel filed exceptions and the Board affirmed the ALO's rulings and conclusions as modified. Specifically, although the Board agreed with the ALO's decisions on witness credibility, the Board concluded that a discharge had occurred and that Zacarias' action in so informing the crew, though mistaken, was imputable to Superior. The Board ordered reinstatement, backpay, and make-whole relief, but determined that in the absence of retaliatory intent and in view of the "uniqueness of the situation," posting, mailing and reading of the Board's "stan-

---

[1]All statutory references are to the Labor Code unless otherwise indicated or apparent.

dard notice" were not required. Further, the Board adopted the ALO's recommendation and dismissed the allegations of the complaint which asserted the discharge of Zacarias was an unfair labor practice.

Superior's petition for review requires us to decide, among other things, whether the action of a crew leader in mistakenly informing members of his crew they (including him) were fired, when the employer had not so ordered or authorized, is imputable to the employer. Under the circumstances of this case we will conclude that such action must be imputed to the employer under the rationale of *Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307 [172 Cal.Rptr. 720, 625 P.2d 263].

Superior's contentions present additional issues which we similarly resolve against Superior. Therefore, we will enforce the Board's order.

## THE FACTS

Superior is an agricultural employer engaged in, among other things, the cultivation and harvesting of various types of "stone fruit," including peaches, apricots and plums. The events at issue took place during the 1979 plum harvest at a Superior farm in Kern County. Zacarias, real party herein and one of the alleged dischargees, was hired as a fieldworker for Superior in late 1978. The following March, Superior made Zacarias a foreman of an apricot-thinning crew and directed him to hire the crew members. When the labor supervisor, Aurelio Menchaca, became aware that the crew Zacarias had purported to hire was inexperienced in thinning stone fruit, Menchaca declined to hire the crew members as Superior employees. Instead, he had them assigned to the payroll of labor contractor Jose Rodriguez.

As crew leader Zacarias was directly responsible to the ranch supervisor. He regularly translated the supervisor's instructions into Spanish for the crew and the crew's complaints into English to the supervisor. At times Zacarias was directed to lay off workers who did not meet Superior's productivity standards but never did so without instructions from the supervisor. Zacarias also supplied contractor Rodriguez with daily crew lists.

The crew worked at a piece rate. Superior had a policy of guaranteeing an hourly minimum wage of $3.25 to workers supplied by a labor contractor whose production was insufficient to earn that minimum at the piece rate. However, that policy was never communicated to Zacarias.

On May 28 the crew began thinning plums. The plum harvest was directed by Martin Veiss, a Superior supervisor. When Veiss arrived at the plum

orchard on May 28, he instructed Zacarias about the correct size and color of plums to be picked and had Zacarias pass around a sample so the crew could "get the feel of it." Veiss informed Zacarias the piece rate would be 70 cents per bucket, but did not mention the hourly minimum. Zacarias called the workers together and explained the pay rate and the way the work was to be done.

The crew experienced problems on the first day of picking. Veiss returned later and found that the crew was leaving ripe fruit on the trees. This prompted Veiss to instruct Zacarias several times during the day to have the crew redo trees already picked so ripe fruit would not be left behind. When Veiss asked Zacarias why the crew was having problems, Zacarias explained that 70 to 80 percent of the crew had never before picked stone fruit. On the first day no worker in the crew picked enough fruit to exceed the guaranteed hourly minimum of $3.25 and each was paid the minimum rate. Over the next two days the crew's production increased. The "first pick," i.e., the initial harvest of plums from the trees, was completed the morning of May 31. Veiss informed Zacarias the crew would repeat the process on the same trees in a "second pick" and that the piece rate for the second pick would be lowered from 70 cents to 60 cents per bucket. Veiss stated that the rate was changed because there would be more fruit to pick the second time around, and picking would not have to be as selective.

The "second pick" began in the late morning of May 31. At the close of work that day, two crew members complained to Veiss about the 60-cent rate and asked him if the 70-cent rate could be reinstated. Veiss told one worker he could not change the rate but would "ask the boss," that is, harvest coordinator Binardi, if something could be done. Veiss testified he spoke to Binardi that evening, but to no avail. Binardi in essence said the 60-cent rate was fair.

On the next day, June 1, the crew began working at the regular time—about 6:30 a.m. After the crew had worked over an hour, Veiss visited the crew at the picking site. He immediately saw that many of the plums were too small for harvesting and showed the undersized fruit to Zacarias. Zacarias then gathered the crew at the bin and demonstrated the problem of undersized fruit by passing some of the fruit through a sizing ring. After that he passed a plum of minimum acceptable size among the crew members for them to "get the feel of it."

After the demonstration, a crew worker asked Veiss if he had obtained a rate raise for the crew. Veiss answered he had not. Another worker asked

Veiss if he could raise the rate to the 70-cent level of the first pick. Veiss replied he could not set the rates and that the matter was out of his hands.

The crew appeared to Veiss to be "not too happy." After about 10 minutes and further discussions, Veiss felt unsure whether they were willing to return to work at the 60-cent rate. He called Zacarias aside and told him, "Well, the price is set, and the crew either has to go in to work or they would [*sic*] have to go home." At the time Veiss made this statement, he angrily threw some plums to the ground and told the workers to take the ladders out of the trees or they would not be paid for the day.

As Veiss started to leave, Zacarias approached him and said he wanted to speak to Menchaca, the labor coordinator. Veiss radioed Menchaca and requested that he come out and speak to the crew, but Menchaca was unable to do so. Veiss then went to the office and informed Menchaca that the crew wanted a rate raise and that he didn't think they were going to work without that raise. Menchaca said he would contact Rodriguez and take care of the matter. As Veiss was leaving, Menchaca told him: "Okay, you've already told them that [i.e., that Veiss would not raise the rate]; leave them [the crew] alone."

Zacarias also went to Menchaca and told him the crew members wanted a raise because they "weren't making wages." Menchaca replied he would try to contact labor contractor Rodriguez and send him to "straighten this deal out." At that point, Rodriguez arrived. In an effort to keep the crew working, Menchaca instructed Rodriguez to tell the crew members they were guaranteed an hourly minimum if they did not make the equivalent at the piece rate. Menchaca further stated that, if the rates were wrong, they would be adjusted later. Rodriguez then went into the office to get some blank timesheets, stating he would be "over there in one second." Zacarias was present during Menchaca's conversation with Rodriguez.

In the meantime, Veiss, after he spoke with Menchaca, had returned to the orchard and was instructing a tree checker how to sucker grafted trees. He saw the crew standing on the outside of the tree rows and saw one or two cars leave the area. As he was leaving to visit his other crews, he saw Zacarias returning from the office. Veiss told Zacarias he had seen a couple of cars leave and if the crew was leaving to make sure the ladders were taken from the orchard. Zacarias did not respond.

When Zacarias returned to the crew, he informed the workers he had been unsuccessful in getting the raise from 60 to 70 cents and that the whole

crew was fired, including him. The crew removed the ladders from the trees and departed.

About an hour after his conversation with Zacarias, Menchaca was informed of the crew's departure and arranged to have the workers replaced by another of Rodriguez' crews that was available for work.

The replacement crew began work the next day. Four alleged dischargees from Zacarias' crew showed up for and were given work that day in the replacement crew. The remaining 22 members of Zacarias' crew, including Zacarias himself, did not appear for work.

A few days later Zacarias went to the ranch and asked Menchaca if any work was available. Menchaca replied that no crew leader positions were available at the time but that he would put Zacarias to work as a regular laborer and would consider Zacarias for any later positions that came up. Zacarias declined, stating he would see if Rodriguez had anything available. Menchaca concluded the discussion by offering to be of assistance to Zacarias if the latter needed help finding work.

## DISCUSSION

Contrary to the conclusion of the ALO, the Board decided that Superior violated subdivision (a) of section 1153 when, as a result of protests against Superior's wage rates, Superior discharged members of the harvesting crew. Subdivision (a) of section 1153 corresponds to section 8(a)(1) of the National Labor Relations Act (NLRA). (29 U.S.C.A. § 158(a)(1).) Thus, California's Act mandates that we rely where appropriate on applicable NLRA precedent. (See § 1148; *Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 855-856 [176 Cal.Rptr. 753, 633 P.2d 263].)

Section 1153 provides in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following:

"(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152."

Section 1152 provides in pertinent part as follows: "Employees shall have the right to self-organization . . ., and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. . . ."

The facts underlying the Board's determination that there was a violation of section 1153, subdivision (a), were described by the Board as anomalous and unique. Nonetheless, the facts the Board relied upon are the facts as determined by the ALO in arriving at his recommended findings. Thus our concern with the applicable standard of review of the Board's decision is a limited one.

Under the Act, the Board's factual findings are conclusive if supported by substantial evidence on the record considered as a whole. (§ 1160.8.) Review of the entire record requires assessment not only of evidence supporting the Board but also of "'other relevant facts of record which rebut or explain that evidence.'" (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727 [175 Cal.Rptr. 626, 631 P.2d 60].) The reviewing court, however, must stop short of reweighing the evidence; the Board has been delegated the primary authority to make credibility determinations and resolve evidentiary conflicts, subject to limited judicial review. (*Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 20-21 [173 Cal.Rptr. 856]; see also *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757 [195 Cal.Rptr. 651, 670 P.2d 305]; *Labor Board* v. *Link-Belt Co.* (1941) 311 U.S. 584, 597 [85 L.Ed. 368, 378, 61 S.Ct. 358].)

An important corollary is that the Board's choice between two fairly conflicting views, each supported by the evidence, will be allowed to stand although we might "justifiably have made a different choice had the matter been before [us] *de novo.*" (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 468, 71 S.Ct. 456], quoted in *Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968, 975 [170 Cal.Rptr. 510].) Moreover, inferences drawn by the Board from credited testimony will be upheld unless demonstrably irrational, tenuous or arbitrary, notwithstanding contrary inferences drawn by the ALO. (*Kopack* v. *N. L. R. B.* (7th Cir. 1982) 668 F.2d 946, 956.)

The rule we glean from the authorities reviewed above is that this court's function begins and ends with insuring that the Board's findings are supported by substantial evidence and that inferences drawn are rational and consistent with the Act. Nonetheless, the right to judicial review is guaranteed by section 1160.8 of the Labor Code and is triggered by the filing of a petition for review. That procedure exists to insure that the Board operates within the parameters of statutory labor policy. (Cf. *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 39-40 [160 Cal.Rptr. 710, 603 P.2d 1306].)

Having all these principles in mind, we consider the reasons Superior contends the Board's order should be vacated and set aside.

*I. Were employees discharged for activity protected by the Act?*

Superior first challenges the Board's conclusion that the crew was discharged for its protected concerted activity in seeking an increase in compensation. Specifically, Superior contends (1) the crew was not "discharged" but voluntarily left Superior's employ because of the low piece rate, and (2) a discharge is not unlawful under the Act unless prompted by an unlawful motive, which, as the Board expressly found, is absent in this case. We reject both contentions because they misconstrue the applicable standards.

Before explaining our reasons for rejecting Superior's contentions, we address a procedural issue raised by Superior. Superior correctly points out that the Board relied upon a theory not alleged in general counsel's complaint in finding that Superior, by virtue of Zacarias' mistake, was responsible for the dismissal of the crew. The complaint filed against Superior, which remained unamended throughout the proceedings before the Board, alleges the company had, "through Martin Veiss, Aurelio Menchaca and Joe Rodriguez discharged Guadalupe Zacarias and all the members of his crew because they engaged in concerted activity to improve the terms and conditions of their employment with [Superior]." The ALO and the Board found that neither Veiss, Menchaca nor Rodriguez had discharged the crew. Instead the Board found that Zacarias, the charging party and one of the alleged dischargees, had told the workers they were fired. It therefore is clear the Board relied upon a theory not alleged in the complaint to find Superior liable for an unfair labor practice.

Under state and federal precedent, however, it is established the Board may apply a theory of liability not alleged in the complaint if the issue was fully litigated by the parties at the administrative hearing. (See, e.g., *N. L. R. B.* v. *Carilli* (9th Cir. 1981) 648 F.2d 1206, 1211; *N. L. R. B.* v. *Bighorn Beverage* (9th Cir. 1980) 614 F.2d 1238, 1241; see also *Prohoroff Poultry Farms* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 622, 628-629 [167 Cal.Rptr. 191].) In fact, the Board has an obligation to decide material issues which have been fairly litigated even though they have not been specifically pleaded. (*Rea Trucking Company* v. *N. L. R. B.* (9th Cir. 1971) 439 F.2d 1065, 1066.)

Superior asserts it was deprived of an opportunity to argue or present evidence to rebut the mistake theory not alleged in the complaint. It is

true that the parties were not focusing upon Zacarias as the potential perpetrator of the discharge; at the hearing Superior did not even question Zacarias about what transpired when he returned to the crew after speaking to Menchaca. Instead, the testimonial emphasis was on what Veiss and Menchaca said and did, since they allegedly were the agents who did the firing. Nevertheless, the substance of what Zacarias said when he returned to the crew was supplied by other testimony, particularly that of Ronald Diaz Franco (Diaz). The ALO expressly credited Diaz' testimony that Zacarias said upon his return to the crew that his efforts to obtain a rate increase had failed and the crew was "fired." The Board accepted this version as accurate. The pertinent facts therefore were established by independent testimony, and it cannot be said the matter was left unlitigated. (See *N. L. R. B.* v. *Carilli, supra,* 648 F.2d at p. 1211 [testimony of other witnesses filled gap in key actor's memory; the issue therefore was "fully and fairly litigated"].)

It also appears that Superior was given ample opportunity to raise arguments before the Board on the mistake theory. In a posthearing brief, general counsel posited the alternative argument that, even if Veiss or Menchaca had not discharged the crew, Zacarias' incorrect representation that the crew was "fired" was imputable to Superior. Superior's posthearing brief addressed the theory: the company conceded that low-level supervisorial mistakes can be made, but submitted "that the evidence is overwhelming that none was made here." Later, in a brief filed with the Board in support of a statement of exceptions to the ALO's decision, general counsel twice urged the alternative mistake theory.[2] Superior responded that Zacarias did not tell the crew it was fired.

We are not persuaded to the contrary by *N.L.R.B.* v. *Complas Industries, Inc.* (7th Cir. 1983) 714 F.2d 729, on which Superior relies. There the original complaint alleged an unfair labor practice in the firing of a single employee. Over objection by the employer, the Board permitted amendment of the complaint at midpoint in a one-day administrative hearing to allege that certain employees had been unlawfully interrogated concerning their union activities, a distinct and independent unfair labor practice. In holding that the Board had violated the respondent employer's procedural due process rights by not providing it with adequate notice and an opportunity to prepare for the amended allegations, the court stated in part: "When a party

---

[2]At page 6 of his brief, general counsel urged: "Even if Veiss did not lead them [the crew] to believe they were fired, it is submitted that the crew members saw Zacarias as a supervisor and thus were reasonable in relying upon his telling them 'they were fired.'" And at page 7: "respondent's [Superior's] failure to remedy Zacarias' actions, *even if incorrect,* must be binding upon respondent." (Italics added.)

is not given meaningful notice of a claim by way of the pleadings, the Board may nevertheless decide that claim if it was fully litigated. The requirement of a full litigation however does not merely entail that the particular unfair labor practice be referred to in the record of the administrative hearing. Full litigation is one way of satisfying the fairness of the means of appraisal of the claimed unfair labor practice. Whether fair notice is given by way of pleading, or by way of the course of the proceedings of a full litigation, the crucial focus at all times is on whether notice was given which provided the party with an adequate opportunity to prepare and present its evidence." (*Id.*, at p. 734.) We believe the amendment of a complaint at midpoint in a one-day hearing to allege a distinct and independent unfair labor practice is substantially different from the change of theory in this case.

Finally, we note that title 8, California Administrative Code, section 20286, subdivision (c), provides for reconsideration and/or reopening the record under circumstances such as were present in this case, but Superior elected not to pursue and exhaust that aspect of its administrative remedy. It therefore is in no position to complain before this court that it did not have an opportunity to be heard on the issue tried before the Board. (See, e.g., *Rivcom Corp.* v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d at p. 756, fn. 6; *Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 971 [157 Cal.Rptr. 476].) Superior's procedural argument must fail.

■ Returning to the merits, the first issue is whether a "discharge" occurred at all. The ALO found, and Superior asserts, that the crew voluntarily walked off the job because it disagreed with the 60-cent piece rate. While this is one supportable view of the record, the Board's finding that the crew was discharged is supported by substantial record evidence and must stand.

■ The test of whether or not an employee has been discharged depends upon "the reasonable inference that the employees could draw from the language used by the employer." (*Liberty Mut. Ins. Co.* v. *N. L. R. B.* (1st Cir. 1979) 592 F.2d 595, 604 and cases cited.) ■ The credited testimony of crew member Diaz established that Zacarias, when he returned from his discussion with Menchaca about increasing the piece rate, told the crew it was fired. The ALO ignored this testimony in concluding that the crew voluntarily left work, reasoning that Superior could in no circumstances be liable for Zacarias' actions. The ALO's analysis on this point is therefore incomplete and is accorded little weight in the review process. The Board accepted the ALO's credibility determination but concluded that the crew members walked off the job because of Zacarias' inaccurate report

to them of Superior's reaction to their request for a higher rate of pay, to wit, that they (including Zacarias) were fired. Given the fact that Zacarias frequently relayed management directives to the crew, the Board's finding that the crew reasonably believed it had been discharged is reasonable and supported by substantial evidence. Therefore, we are bound by that finding on review.

■ Superior's other contention, which we reject, is that the unlawful discharge finding cannot stand because it is undisputed no one acting on Superior's behalf harbored an unlawful antiunion or anticoncerted-action motive in discharging the crew. Although many cases have stated that such a motive is required, we believe the real issue in any case of unlawful discharge is that of causation. If the discharge or discipline is causally related to protected labor activities of the affected employees, the Act is violated irrespective of any inquiry into the employer's subjective state of mind. Superior recognized this when it used the so-called "motive" requirement interchangeably with a test requiring that general counsel prove "that the employees were discharged or otherwise discriminated against *for engaging in concerted activity.*" (Italics added.) An examination of the relevant principles will demonstrate why a causation analysis necessarily subsumes inquiry into the employer's motive.

■ Labor legislation does not purport to interfere with an employer's ordinary disciplinary decisions or its right to discharge employees for any reason whatsoever other than one proscribed under the statutory scheme. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, 728-729.) The Act expressly codifies this principle. Section 1160.3, which outlines the permissible bounds of the Board's remedial authority, provides in part: "No order of the board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any backpay if such individual was suspended or discharged for cause." If the only cause relied upon by the employer for discharging or otherwise disciplining employees is the fact that the latter engaged in activity protected by the Act, an unfair labor practice has been proven irrespective of whether the evidence also demonstrates "antiunion animus" or other malevolent states of mind. The cases implicitly bear this out. (See, e.g., *N. L. R. B.* v. *Transportation Management Corp.* (1983) — U.S. — [76 L.Ed.2d 667, 673, 103 S.Ct. 2469, 2472]; *Labor Bd.* v. *Washington Aluminum Co.* (1962) 370 U.S. 9, 16-17 [8 L.Ed.2d 298, 303-304, 82 S.Ct. 1099].)

Even in the so-called "dual motive" case, that is, where the employer arguably possessed both lawful and unlawful reasons for disciplining an

employee, the California Supreme Court, following the lead of the NLRB and several federal courts, recently adopted a test whereby the controlling inquiry is whether the employees' protected activity was a "but for" *cause* of the discharge or other discipline. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.*, *supra*, 29 Cal.3d 721, 730.)

Even assuming unlawful motive or antiunion animus is an indispensable element of a charge grounded upon the antidiscrimination proscription of section 1153, subdivision (c),[3] it should be noted that this court, among others, has observed that motive is not an essential element of a charge founded upon the more general anti-interference proscription of section 1153, subdivision (a). (*M. B. Zaninovich, Inc.* v. *Agricultural Labor Relations Bd.* (1981) 114 Cal.App.3d 665, 675, and fn. 3 [171 Cal.Rptr. 55]; *Merrill Farms* v. *Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 176, 183-184 [169 Cal.Rptr. 774].) Instead, the test under section 1153, subdivision (a), with which we are concerned in this case, is whether the employer engages in conduct "which it may reasonably be said tends to interfere with the freedom of the exercise of the employee's rights under the act." (*Merrill Farms, supra,* at p. 184; *Pandol & Sons* v. *Agricultural Labor Relations Bd.* (1979) 98 Cal.App.3d 580, 586 [159 Cal.Rptr. 584].) It need not be shown that the employer *intended* to produce a coercive effect. (*Zaninovich, supra,* at p. 679, fn. 3.)

Accordingly, we apply a causation analysis to the facts of the instant case. Here it is undisputed that Zacarias' crew was engaged in protected concerted activity when it mutually sought a rate increase. That Superior was aware of the crew's activity also is not questioned. The crucial question is whether there is an unbroken causal chain between the protected activity and the ultimate discharge. The Board urges that discharge was a direct result of the crew's wage dispute. Superior asserts the discharge was caused by the independent mistake of Zacarias and was not directly linked to the protected activity. The fact is that the mistake or misinterpretation of Zacarias was part of a chain of events set in motion by the crew's concerted wage protest and cannot be deemed an innocuous, independent cause of discharge.

The real issue is whether the record sufficiently establishes that the crew's protected activity was a cause in fact or "but for" cause of the discharge. This follows by analogy to *Martori Brothers, supra,* 29 Cal.3d 721. Supe-

---

[3]Section 1153, subdivision (c), provides it is an unfair labor practice for an employer "[b]y discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization."

rior urges that Zacarias' mistake was the *only* cause of the discharge, but unless it can be said that the mistake would have occurred in any event, the crew's protected activity must be seen as a predicate contributing cause. (See generally, 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 622, p. 2903.) The record does not establish the reason for Zacarias' mistake. Moreover, it is undisputed the mistake was unreasonable: the Board implicitly so found when it dismissed the complaint vis-a-vis Zacarias, a conclusion that must have been based on an implicit finding that Zacarias could not reasonably have believed that he himself had been discharged. When he returned to the crew, however, there was no room for misinterpreting his words, and the remainder of his crew was perfectly reasonable in assuming itself fired. The mistake doubtlessly was a "but for" cause of the termination. But it is also true that the mistake would not have occurred "but for" the crew's request for a wage increase. Even if unreasonable, the mistake did not break the direct causal chain between the concerted activity and the discharge. The record thus leaves no doubt that the unfortunate and unintended result was directly related to activity covered by the Act. Assuming Superior is liable for Zacarias' actions, which we will discuss later in this opinion, his misconceived actions must be deemed an unfair labor practice. (See, e.g., *Lawrence Scarrone* (1981) 7 ALRB No. 13; *Labor Board* v. *Burnup & Sims, Inc.* (1964) 379 U.S. 21 [13 L.Ed.2d 1, 85 S.Ct. 171].) The rationale in both cited cases was that, despite the employer's ambiguous or even innocent intent, a coercive impact upon the employees was guaranteed.

By analogy to the *Scarrone* and *Burnup & Sims* cases, the fact that the discharge in the instant case was a product of a mistake should not shield the employer from liability. Zacarias evidently *believed* he and the crew were being discharged for their effort in seeking a rate increase. His statement to the crew to that effect necessarily had a coercive impact on the crew members; the only conclusion they could have drawn was that they were being punished by either Veiss or Menchaca for having exercised their statutory rights. It therefore must be concluded that if Superior is liable for Zacarias' actions, the unfair labor practice finding must stand.

II. *Assuming Zacarias mistakenly discharged the crew because of its protected activity, is Zacarias' conduct imputable to Superior?*

Superior finally challenges the Board's decision insofar as it held Superior liable for the mistaken conduct of Zacarias under the liberal standard of employer responsibility enunciated in *Vista Verde Farms* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 307. Superior succinctly states its position thus: "It offends our sense of justice to impose financial

liability on Superior for an act of Zacarias if it occurred at all over which the company had no control." As previously indicated, this is a central issue in this case.

In *Vista Verde* the Supreme Court noted the parallels between the ALRA and the NLRA, summarized a long line of consistent federal authority adopting a liberal approach to employer responsibility for acts of agents or quasi-agents, and distilled a standard whereby the question of employer responsibility is viewed from the standpoint of the affected employees and is not governed by common law agency principles. Relying heavily upon *I. A. of M.* v. *Labor Board* (1940) 311 U.S. 72 [85 L.Ed. 50, 61 S.Ct. 83] and *H. J. Heinz Co.* v. *Labor Board* (1941) 311 U.S. 514 [85 L.Ed. 309, 61 S.Ct. 320], the court in *Vista Verde* stated: "[W]hether or not the drafters of the ALRA intended to go beyond the liberal principles articulated in the federal cases, we think that it is clear that in general an employer's responsibility for coercive acts of others under the ALRA, as under the NLRA, is not limited by technical agency doctrines or strict principles of respondeat superior, but rather must be determined, as *I. A. of M.* and *Heinz* suggest, with reference to the broad purposes of the underlying statutory scheme. ■■■ Accordingly, even when an employer has not directed, authorized or ratified improperly coercive actions directed against its employees, under the ALRA an employer may be held responsible for unfair labor practice purposes (1) if the workers could reasonably believe that the coercing individual was acting on behalf of the employer *or* (2) if the employer has gained an illicit benefit from the misconduct and realistically has the ability either to prevent a repetition of such misconduct in the future or to alleviate the deleterious effect of such misconduct on the employees' statutory rights." (*Vista Verde, supra*, 29 Cal.3d at p. 322, italics added.)

■■■ Although the Board's decision is not entirely clear on this point, the finding of employer responsibility in this case appears to have been grounded upon the first alternative aspect of the *Vista Verde* test: that is, that Zacarias' crew reasonably believed Zacarias spoke on management's behalf when he said the crew had been fired. The two factors expressly relied upon by the Board were (1) Superior had a practice of "relaying orders through Zacarias," and (2) the company never disavowed or countermanded Zacarias' order, even though "it must have become immediately apparent that the crew was no longer working." With respect to the first point, the Board quoted from that portion of the *Vista Verde* opinion in which the court summarized the holding of *I. A. of M.* v. *Labor Board, supra*, 311 U.S. 72, 80 [85 L.Ed.50, 56]: "Observing that whereas the lead men whose actions were in question 'were not high in the factory hierarchy and apparently did not have the power to hire or to fire[,] . . . they did

exercise general authority over [other] employees and were in a strategic position to translate to their subordinates the policies and desires of the management' . . . the court concluded that the Board could properly hold the employer responsible for their actions." (*Vista Verde, supra,* 29 Cal.3d at p. 319.) For the reasons we shall discuss, we believe Zacarias occupied such a strategic position.

A detailed examination of Zacarias' duties led the ALO to conclude that as a crew leader Zacarias was not a supervisor within the meaning of the Act.[4] The Board affirmed the ALO on this point. ██ Contrary to Superior's assertion, supervisory status is not controlling; subsupervisorial personnel can bind an employer in appropriate circumstances. (See, e.g., *N. L. R. B.* v. *Intern. Medication Systems, Ltd.* (9th Cir. 1981) 640 F.2d 1110, 1112, fn. 1; *Helena Laboratories Corp.* v. *N. L. R. B.* (5th Cir. 1977) 557 F.2d 1183, 1187.) Nothing in *Vista Verde* or the federal cases relied upon in that opinion purports to place such a limitation on employer responsibility.

██ We believe the role which Superior permitted Zacarias to occupy with relation to the crew is determinative in this case. Although Zacarias exercised very little independent judgment as a "crew boss," he regularly translated orders given by his superiors to the crew and acted as a "conduit" to relay work instructions and pay rates. Given Zacarias' role as the interface between the crew and management and his frequent duties as a conveyor of management policy to those under him, there is substantial evidence to support the conclusion that the crew reasonably believed Zacarias was acting on management's behalf in delivering the news of the "discharge" following his conversation with Menchaca. Therefore, while we agree with the Board that the facts of this case are anomalous, we affirm its finding that Superior was properly held responsible for Zacarias' actions.[5]

---

[4]Labor Code section 1140.4, subdivision (j), provides: "The term 'supervisor' means any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if, in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

[5]The other factor which the Board relied upon, that is, that the company never disavowed or countermanded Zacarias' "order" even though "it must have become immediately apparent that the crew was no longer working," is not persuasive. A few hours before the crew left Superior's premises, Veiss had offered the workers the alternative of either working at the established rate or leaving. This was the credited testimony of crew member Diaz. Moreover, there is no evidence in the record that anyone other than Zacarias and his crew ever knew prior to the filing of the unfair labor practice charge with the Board that Zacarias had told the members of the crew they (including him) were fired. Under these circumstances, the fact the crew was no longer working could not reasonably have alerted Superior to

Superior's arguments to the contrary are unavailing. The company first urges it cannot fairly be held responsible for Zacarias' act since Zacarias was unquestionably acting for and on behalf of his crew in presenting the wage dispute to Menchaca. As such, he was himself engaged in protected labor activity. Superior urges that Zacarias could not conceivably be acting as an agent of both management and his crew at the same time.

We agree that in most cases the Board cannot reasonably determine that an employer is responsible for the actions of a person who is acting for and on behalf of the employees and against management's interests. Under normal circumstances the Board cannot reasonably infer that the fellow employees of one acting on their behalf and against management reasonably perceive that such a person speaks on behalf of management. This principle has been recognized in a line of NLRB cases beginning with *Montgomery Ward & Co., Incorporated* (1956) 115 N.L.R.B. 645, 647, and followed in federal appellate cases cited by Superior, namely, *Connecticut Distributors, Inc.* v. *N. L. R. B.* (2d Cir. 1982) 681 F.2d 127, 129; *Nazareth Regional High School* v. *N. L. R. B.* (2d Cir. 1977) 549 F.2d 873, 883-884; and *N. L. R. B.* v. *Sayers Printing Company* (8th Cir. 1971) 453 F.2d 810, 817.) For the reasons we shall discuss, however, these cases do not persuade us that the Board's decision in the instant case should be vacated.

In *Connecticut Distributors, Inc.* v. *N. L. R. B.*, *supra*, 681 F.2d 127 the court stated: "Even assuming Capasso's duties were supervisory, however, the Board erred in saddling the company with responsibility for his anti-union efforts. The cases of *Montgomery Ward & Co.* . . . and *Nazareth Regional High School* . . . [both cited above] hold that when a supervisor is a member of the union the company is responsible for his circulation of anti-union petitions only if it encouraged, authorized or ratified—in other words affirmatively participated in—the supervisor's activities." (*Id.*, at p. 129.) In a footnote in that opinion, the court stated, "The Board argues for a different standard, under which company involvement would be evidenced by the employees' perception that the employee circulating the decertification petition had 'management's blessing,' which the Board claims was the case here. This standard is foreclosed by *Montgomery Ward* and *Nazareth*, however, which refer to an objective test of affirmative company participation, rather than the subjective analysis the Board proposes." (*Id.*, at p. 129, fn. 1.) We believe the court in *Connecticut* misstates the law.

the fact that they had been fired; instead, given the nature and extent of the crew's dissatisfaction with the 60-cent rate, the company could only have concluded the crew departed because it was unwilling to continue working at that rate. Without the crew's knowledge of Zacarias' past role assigned him by Superior there would be no basis to impute his action to Superior.

The *Connecticut* court looked to the decision in *Nazareth Regional High School* v. *N. L. R. B.*, *supra*, 549 F.2d 873, also a Second Circuit case, which stated in part, "When the involved supervisors are also part of the bargaining unit, however, affirmative participation by the employer in the anti-union activity must be found to support a claim of coercion." (*Id.*, at p. 883.) The court in *Nazareth* relied in part upon the decision in *Montgomery Ward & Co., Incorporated, supra.* However, the actual standard enunciated by the NLRB in *Montgomery Ward* is an either/or test, of which affirmative employer participation is only one half. The alternative theories of responsibility defined in *Montgomery Ward* appear in the following excerpt from that opinion: "Statements made by a supervisor violate Section 8 (a) (1) of the Act when they reasonably tend to restrain or coerce employees. When a supervisor is included in the unit by agreement of the Union and the Employer and is permitted to vote in the election, the employees obviously regard him as one of themselves. Statements made by such a supervisor are not considered by employees to be the representations of management, but of a fellow employee. Thus they do not tend to intimidate employees. For that reason, the Board has generally refused to hold an employer responsible for the antiunion conduct of a supervisor included in the unit, in the absence of evidence that the employer encouraged, authorized, or ratified the supervisor's activities *or acted in such manner as to lead employees reasonably to believe that the supervisor was acting for and on behalf of management.*" (*Montgomery Ward, supra,* 115 N.L.R.B. at p. 647, italics added.)

The *Nazareth* court offered no explanation for dropping the second alternative test developed in *Montgomery Ward.* Significantly, the *Montgomery Ward* test flowed from the United States Supreme Court's decision in *I. A. of M.* v. *Labor Board, supra,* 311 U.S. 72, which was later relied upon by the California Supreme Court in its decision in *Vista Verde Farms.* The court in *I. A. of M.* stated in part that "where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." (*I. A. of M.* v. *Labor Board, supra,* 311 U.S. at p. 80 [85 L.Ed. at p. 56].)

Thus we consider the decision in *Nazareth* questionable for its neglect of half of the standard on which it purports to rely. Additionally, it fails to consider applicable authority from the United States Supreme Court. Similarly, when the courts in *Connecticut Distributors, Inc., supra,* 681 F.2d 127, and *N. L. R. B.* v. *Sayers Printing Company, supra,* 453 F.2d 810, rejected a subjective analysis, they too misread *Montgomery Ward* and ig-

nored the authority of the United States Supreme Court in *I. A. of M.* v. *Labor Board, supra,* 311 U.S. 72. The subjective analysis is well established in law, and we are not persuaded by the cases just reviewed that it should be rejected by this court. To do so would ignore the provisions of section 1165.4[6] and the decision of the California Supreme Court in *Vista Verde Farms.*

Superior's second argument on the agency issue is that Zacarias' actions could not fairly be imputed to the company absent company knowledge of the assertedly wrongful conduct. This contention is foreclosed not only by the subjective test set forth in *Vista Verde* but also by the terms of section 1165.4, under which the question of agency does not necessarily depend upon actual authorization or subsequent ratification of the actor's conduct. (See fn. 6, *ante.*) Even if an employer is utterly unaware of the unlawful coercive actions of a subordinate, the Board is not precluded from finding that the affected employees reasonably believed the offending individual was acting on behalf of management, the key to the subjective test enunciated in *I. A. of M.* and *Vista Verde.*

Having so concluded, we pause to sound a note of caution. Notwithstanding the liberalized agency rules under the Act as interpreted by the Supreme Court in *Vista Verde, supra,* 29 Cal.3d 307, no rational labor policy is served by imposing strict liability on agricultural employers for the coercive acts of any supervisorial or subsupervisorial employee toward his or her underlings. (Cf. *N. L. R. B.* v. *Bel-Air Mart, Inc.* (4th Cir. 1974) 497 F.2d 322, 324 [NLRA "does not purport to create a per se rule that guards are agents of their employers for all purposes and at all times"].) The *Vista Verde* court recognized that employer responsibility must be determined "with reference to the broad purposes of the underlying statutory scheme." (29 Cal.3d at p. 322.) Moreover, one of the principal authorities relied upon in *Vista Verde* noted that the ultimate question is whether interference occurred "for which the employer may fairly be said to be responsible." (*I. A. of M.* v. *Labor Board, supra,* 311 U.S. at p. 80 [85 L.Ed. at p. 56]; see also *Labor Board* v. *Link-Belt Co., supra,* 311 U.S. 584, 599 [85 L.Ed. 368, 379]; *N. L. R. B.* v. *General Industries Electronics Company* (8th Cir. 1968) 401 F.2d 297, 300.) The facts of each case must be closely scrutinized to determine the apparent authority of the alleged agent from the standpoint of the individuals affected by the improper conduct. No rule, including that enunciated in *Vista Verde,* should be applied mechanically

[6]Labor Code section 1165.4 provides: "For the purpose of this part, in determining whether any person is acting as an agent of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

without regard to circumstances, reasonableness, and fairness. In the present case, although we can appreciate Superior's position and the arguments it advances, we affirm the finding of company responsibility for the misapprehension of Zacarias because it is beyond question that the crew could reasonably have believed Zacarias was merely continuing to act in his "conduit" role when he delivered news of the "discharge."

III. *Was a backpay order excessive?*

Superior argues that the Board's order of backpay to the dischargees was unwarranted on the facts of this case. We disagree.

"The Board in its presumed expertise must be given relatively free reign [*sic*] in determining which remedy will best effectuate the policies of the act. It is only when the remedies ordered by the Board are patently outside the Board's authority that a reviewing court can interfere." (*Jasmine Vineyards, Inc.* v. *Agricultural Labor Relations Bd., supra,* 113 Cal.App.3d 968, 982; *Pandol & Sons* v. *Agricultural Labor Relations Bd., supra,* 98 Cal.App.3d 580, 588; see also *Fibreboard Corp.* v. *Labor Board* (1964) 379 U.S. 203, 216 [13 L.Ed.2d 233, 241, 85 S.Ct. 398].) A remedial order will, however, be annulled if it is fairly classified as punitive and not remedial. (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 940 [156 Cal.Rptr. 152]; *Republic Steel Corp.* v. *Labor Board* (1940) 311 U.S. 7, 12 [85 L.Ed.6, 10-11, 61 S.Ct. 77].)

An award of backpay is statutorily authorized and is a common remedy to redress the effects of an unlawful discharge. (§ 1160.3; *Labor Board* v. *Seven-Up Co.* (1953) 344 U.S. 344, 346-347 [97 L.Ed. 377, 381, 73 S.Ct. 287]; see also *Butte View Farms* v. *Agricultural Labor Relations Bd., supra,* 95 Cal.App.3d 961, 967-968.) Such an award will be upheld " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " (*Labor Board* v. *Seven-Up Co., supra,* 344 U.S. at p. 347 [97 L.Ed. at pp. 381-382].) There are two limitations. First, the record must support an inference that the subject employees had a reasonable expectation of continuing employment at the company in question had the unlawful conduct not occurred. (*George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 111 Cal.App.3d 258, 278 [168 Cal.Rptr. 537].) Second, the Board must consider the element of mitigation of damages. (*Labor Board* v. *Seven-Up Co., supra,* 344 U.S. at p. 346 [97 L.Ed. at p. 381].) The Board points out that the latter requirement is mandated in backpay proceedings before the Board (Cal. Admin. Code, tit. 8, § 20290) and that Superior will have the opportunity to litigate such issues as whether mem-

bers of Zacarias' crew were later rehired by the company and the length of time the company would have had work for the crew. (See *Kawano, Inc. v. Agricultural Labor Relations Bd.* (1980) 106 Cal.App.3d 937, 955 [165 Cal.Rptr. 492].)

■■■■ The record in the present case supports the backpay award. There is ample room for an inference that Zacarias' crew would have continued to work at Superior had the discharge not occurred. Although the discharge was the product of a mistake and was unaccompanied by evil or unlawful intent on Superior's part, a coercive impact upon the crew was guaranteed since the "discharge" occurred close on the heels of the crew's mutual and peaceful attempt to gain a rate increase. The award is not a patent excursion beyond the boundaries of the Act. Therefore, we uphold the backpay order.

We affirm the Board's decision and enforce its order.

Zenovich, Acting P. J., and Woolpert, J., concurred.

A petition for a rehearing was denied February 22, 1984, and petitioner's application for a hearing by the Supreme Court was denied April 18, 1984. Bird, C. J., did not participate therein.